Howard G. KLINGER et al., Appellants,

v.

Melvin W. PETERSON et ux., Appellees.

Melvin W. PETERSON et ux., Cross-Appellants,

v.

Howard G. KLINGER et al., Cross-Appellees.

Nos. 1218, 1220.

Supreme Court of Alaska.

June 25, 1971.

Neil S. MacKay, Anchorage, for appellant-cross-appellee Howard G. Klinger.

Peter B. Walton, Boyko & Walton, Anchorage, for appellant-cross-appellee Harold G. Wills.

Burton C. Biss, Anchorage, for appellees-cross-appellants Melvin W. Peterson and Ruth G. Peterson.

Before DIMOND, RABINOWITZ and CONNOR, JJ.

## OPINION

CONNOR, Justice.

This case concerns the exercise of an option, contained in a lease agreement and its supplements, to purchase certain real property. There is also presented a question of whether, before the attempted exercise of the option to purchase, the lease was terminated, thereby preventing the option from being invoked.

Melvin W. Peterson and Ruth G. Peterson, hereafter called lessors, are the owners of commercial real property situated at the corner of Lake Otis Road and Northern Lights Boulevard in Anchorage, Alaska. The building on the property was original-

ly a grocery store, but has been expanded several times since lessors became the owners. On August 27, 1957, lessors leased the property to Howard G. Klinger and Harold G. Wills, hereafter called lessees. The lease provided for a term of five years, commencing September 1, 1957, and ending September 1, 1962, for a monthly rent of $250, with a security deposit of four months' rent, and for an option to renew the lease or to purchase the property, in the following terms:

"The Lessors hereby grant unto the Lessees an option to purchase the premises leased hereunder, at the end of the five year period, the purchase price to be $50,000.00 (FIFTY THOUSAND DOLLARS), which price shall include the land and building and all property leased hereunder; notice of intent to exercise said Option to be given in writing by the Lessees to the Lessors, not less than thirty days prior to the expiration of this Lease.

"The Lessors hereby grant unto the Lessees an option to renew this Lease at the end of the five year term, for an additional five year term in the event they do not elect to exercise their option to purchase at that time. Said additional five year renewal period shall be at the same terms and conditions as outlined herein."

Several months later, it was agreed that lessors would expand the building and that lessees would pay an increased rent to amortize the improvements. On March 26, 1958, the parties signed a document, called a lease supplement. It provided that upon installation of the improvements the rent would be increased to $694.43 per month, and the security deposit would be increased to four times the monthly rental. The term of the lease was still to end on September 1, 1962, the date fixed in the original agreement. The price of the option to purchase was increased to $85,000 by the following language:

"The 3rd paragraph, page 3, of said lease is hereby amended to provide for pay-

ment by the lessees to the lessors the sum of eighty five thousand dollars ($85,-000.00) in lieu of the fifty thousand dollars ($50,000.00), should lessees exercise their option to purchase the premises at the end of the five year period as heretofore provided."

Later in the same year an additional expansion of the building, and an increased rent, was agreed to. The parties signed a second lease supplement on August 27, 1958. It provided for a new term of ten years, commencing upon the completion of the addition or occupancy of it by lessees, whichever occurred first, with the last day of the term to be ten years thereafter. The rent was increased to $1,113.60, the security deposit was increased, and lessees were permitted to sublet portions of the structure. The price of the purchase option was increased to $150,000. The language about the exercise of that option read as follows:

"The 3rd paragraph, page 3 of said LEASE and paragraph 6 of the SUPPLEMENT NO. 1 are hereby amended to provide for payment by the LESSEES to the LESSORS the sum of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00) in lieu of the EIGHTY-FIVE THOUSAND DOLLARS ($85,000.00) contained in the SUPPLEMENT NO. 1, should the LESSEES elect to exercise their Option to Purchase said premises; said Option may not be exercised prior to September 1, 1962."

In altering the period of the lease, the following language was employed:

"[T]he LEASE is hereby amended so as to extend the LEASE PERIOD for a TOTAL OF TEN YEARS (10 years) commencing with the effective date of this SUPPLEMENT NO. 2, at a monthly rental rate of ONE THOUSAND ONE HUNDRED AND THIRTEEN DOLLARS AND SIXTY CENTS ($1113.60)."

It should be noted that a basic alteration of the terms of the agreement was effected by the second supplement. The lease-

hold term was now for ten years, and would end at some time after August 27, 1968. While the earlier agreements referred to the exercise of the purchase option merely at the end of the five-year term, the condition now was that it "not be exercised prior to September 1, 1962."

By 1960 lessees had sublet the entire premises. Thereafter they failed to make timely rent payments to lessors on various occasions during the course of the lease. Other breaches occurred, such as failure to make repairs and to carry required liability insurance. Some of these defaults were remedied by the subtenants' doing the necessary repairs and deducting the costs from their rent payments.

The effect of the breaches of the lease by appellants will be discussed later. What is important presently is that in May of 1967 and afterward the lessors sought by various means to terminate the lease and took the position that lessees no longer had any rights as tenants.

Lessees, in 1967, brought an action to restrain lessors from interfering with their rights as lessees. By an amended complaint filed July 25, 1968, lessees sought specific performance of their option to purchase the property for $150,000. They asserted that the repudiation of the agreement by lessors relieved lessees of the need to make a formal tender of the purchase price. Nevertheless, while the litigation was in progress, lessees did, on July 18, 1968, notify lessors that they would exercise their option on August 27, 1968, at 11:00 a. m., at the First National Bank of Anchorage. Lessees appeared in accordance with the notice, but lessors did not appear there to accept tender of the purchase price.

In the disposition of this case the trial judge held that the option to purchase, granted by the second lease supplement, no longer existed in 1968. Therefore, any exercise of the option by lessees was ineffective. He found that the option could have been exercised only on September 1, 1962, and on no other date, that the language of the second lease supplement was unambiguous, unequivocal, and capable of no other interpretation, and that the option expired after September 1, 1962. From this decision lessees appeal.

## INTERPRETATION OF THE OPTION TO PURCHASE

The question is whether the option to purchase the property could be exercised as late as August 27, 1968. The trial court interpreted the relationship between the parties as creating separate agreements as to the lease term and the option to purchase. In so doing the court relied upon Denver Plastics, Inc. v. Snyder, 160 Colo. 232, 416 P.2d 370 (1966), as authority that the lessees could either exercise the option to purchase or extend the term of lease beyond 1962, but that they could not extend the term of the lease for five years and still exercise the option during the second five-year term. The court concluded that the purchase option could be exercised only on September 1, 1962, and that it lapsed thereafter.

We find this interpretation difficult to accept.

First, Denver Plastics, Inc. v. Snyder, supra, is distinguishable from the case at bar. There the lease was phrased in strict alternatives: by its terms it would expire unless one of two choices were made. The lease could be extended or an option to purchase could be exercised. But the lessee extended the lease and later sought to enforce the option provision. The court held this impermissible, as the extension of the lease was tantamount to an election to forego the benefit of the option.

By contrast, in the case before us, under the second supplement the lease was to run for ten years regardless of whether the option to purchase was exercised at any time.[1]

1. The superior court also relied for its interpretation on cases cited and discussed at Annot., 15 A.L.R.3d 470, 473, 482–84, 487–89 (1967). Each of these cases is distinguishable in one or more respects. Most of them concern either

Second, it is difficult to read the language concerning the option, "may not be exercised prior to September 1, 1962", as the equivalent of "may be exercised only on September 1, 1962." Such an interpretation would mean that during a ten-year relationship, a substantial right arose and vanished all in one day. Surely this would be justified only if the language used pointed clearly to such a result. The words "not * * * prior to September 1, 1962" seem rather to imply that what was before then prohibited would become permissible thereafter, as long as the contractual agreement subsisted between the parties. The lease, by the terms of the second supplement, was to obtain for ten years after lessees either took possession of the new addition to the building or the addition was completed, whichever occurred first.

Third, if we treat the original lease agreement as the basic document, with the second supplement merely creating an "extension" of the original term, an important barrier would have to be overcome in order to rule in favor of lessors. This is because the original agreement says that the lessees may, at the end of the original five-year term, extend the lease for an additional five-year term, "in the event they do not elect to exercise their option to purchase at that time. Said additional five-year renewal period shall be at the same terms and conditions as outlined herein."

■ In the vast majority of American jurisdictions such ambiguous language has been held to carry forward the option to purchase into the renewed or extended term. Hindu Incense Mfg. Co. v. MacKenzie, 403 Ill. 390, 86 N.E.2d 214 (1949); Lexington Flying Service, Inc. v. Anderson's Executor, 239 S.W.2d 945 (Ky.1951); Moiger v. Johnson, 86 U.S.App.D.C. 219, 180 F.2d 777 (1950). The few authorities to the contrary resort to the rigid view that the option to purchase must, to survive, be expressly mentioned as carrying over into the extended or renewed period. See

the execution of new leases, with no reference to an earlier option, or documents containing language making it plain that

Pettit v. Tourison, 283 Pa. 529, 129 A. 587 (1925). This reflects adherence to the view that the option to purchase does not directly affect or concern the ordinary relationship of landlord and tenant. Therefore, it should not be deemed to "run with the land" and bind the holder of the reversion, absent clear expression of such an intention. Sherwood v. Tucker, [1924] 2 Ch. 440 (Ct.App.Eng.1924). Most American courts, however, attempt to gather the intention of the parties from an examination of the whole transaction and an objective interpretation of the particular language used by the parties. We favor that approach.

In the case before us we find the second supplement to be more than a simple extension of the lease.

■ It brings about what is essentially a different agreement between the parties. It significantly alters the length of lease term, the amount of rent, and the amount of purchase price in the event that the option to purchase is exercised. It is noteworthy that the parties dealt with both the lease term and option in each agreement as parts of the entire bargain between them. We can find no sound reason for regarding the lease and the option as severable contractual obligations in this particular setting. By continuing to allow to lessees an option to purchase "not * * * prior to September 1, 1962," but by fixing a total lease term to end at some time after August 27, 1968, it is apparent that the second supplement expressed one indivisible bargain. Accordingly, the option to purchase had vitality until the end of the new term.

We conclude that on July 18, 1968, lessees had an enforceable right to exercise the option to purchase and compel specific performance of the agreement. This assumes, of course, that lessees still had rights under the lease agreement and that it had not been terminated. These are the questions we must next discuss.

the parties did not intend to carry the option into the renewed or extended term.

## TERMINATION OF THE LEASE

We have noted earlier that the lessees at various times failed to live up to certain duties they had undertaken in entering into the lease with the lessors. Some of these defaults were taken care of by having the sub-tenants pay into an account at an Anchorage bank, from which rent was paid to the lessors with the balance paid to lessees. However, in 1967 this account was no longer in existence. Lessees failed to make payments of the monthly rental in February, March, and April of 1967. Lessors sought to take action to enforce their rights under the lease. Mr. Peterson returned to Anchorage to look into the whole problem. He had difficulty locating Klinger, whose address and whereabouts were then unknown. When the rent for the month of May had not been paid, Peterson sent notices to quit to the sub-tenants and to lessees, by mailing and by leaving a copy on the leased premises.

After the notices to quit had been served, lessees commenced the action which is now before us in which they sought an injunction against an interference with their rights under the lease. Not long after that the lessors filed a summary eviction action in the district court. In July of 1967 judgment was entered in favor of the lessors for possession of the premises and for the then unpaid May, June and July rent. No back rent was tendered or paid before the entry of the judgment. The lessees sought review of the judgment in the superior court. That court affirmed the money portion of the district court judgment but reversed the remainder of that judgment on the ground that the district court lacked jurisdiction to entertain such an action, *i. e.* an action for the recovery of possession by the landlord.

In July of 1967 the lessors entered into instruments of lease with the former sub-tenants who thereafter paid their rent directly to the lessors. On December 20, 1967, one of the sub-tenants filed a complaint in intervention alleging that it occupied part of the property and that both lessors and lessees were claiming the rents. After that the rents of some of the sub-tenants were paid into the registry of the court, the other tenants were still paying their rent to an attorney for the lessees.

On July 25, 1968, the complaint in the action before us was amended to seek specific performance of the lease and to compel the lessors to recognize an exercise of the option to purchase by the lessees. After trial the superior court determined that the lessees had breached the terms and covenants of the lease in a number of respects over a substantial period of time. But the court also found that the Petersons were not entitled to terminate the lease for these defaults, apparently because of the particular language employed in the lease or because the security deposit and monies in the registry of the court were available to make good the defaults.

■ Lessors have appealed, claiming that the superior court erred in failing to find that the lease was terminated. It is argued that termination occurred because of the breaches of the lease by the lessees, coupled with lessors' notices to quit the premises; that the court erred in setting aside the judgment of the district court as to rentals, interest, and costs; that the court erred in ruling that the lessors could not terminate the lease when the lessees had defaulted and that the lessors must instead deduct rental payments and repairs from the security deposit; and that the court erred in holding that lessees, rather than lessors, were entitled to occupy the building until September 1, 1968.

The lessors argue that the lease was terminated by them in May of 1967. With one exception not material here,[2] the lease

---

2. The only provision in any of the documents permitting lessors to terminate the lease before the end of the term concerns use of the premises for "any illegal purpose whatever." It is not contended that any illegal business was ever conducted on the premises at any time.

was silent about the right of termination by lessors in the event that lessees failed to fulfill their obligations under the terms of the lease agreement.

Lessees argue that since the lease did not provide otherwise, it could only be terminated, for failure to pay rent, by a judgment in the superior court under AS 09.45.690, quoted infra.

All of lessors' arguments challenge the central ruling below that the lease was not terminated. Our disposition of this major question will dispose of lessors' various contentions.

At early common law a lease for a term of years was regarded as a conveyance of an estate in land, less than a freehold. The reservation of rent by the landlord did not impose a contractual liability upon the lessee. Rent was regarded primarily as a charge upon the land. The duty to pay devolved upon the tenant who enjoyed the land, the tenant being bound to the landlord by "privity of estate." 1 Tiffany, Landlord & Tenant, Sec. 171, at 1029 (1912). Absent a contrary agreement or custom, rent was not payable until the expiration of the lease or the end of the rental period, if one was specified. This reflected the belief that rent, being part of the profits of the land, should not be payable until earned through the tenant's enjoyment of the premises. 1 Tiffany, supra, Sec. 172, at 1035. Nor did the failure to pay rent forfeit the tenant's estate. The breach gave rise merely to a right of action for damages.

For these reasons it became customary to insert conditions subsequent in leases, expressly permitting forfeiture for certain breaches of the covenants of the lease. Even such leases have presented interpretative problems. For this reason, and because the old doctrine about non-termination for breach of covenant still persists, statutes have been passed which aid the lessor in regaining possession of the premises and in cutting off the rights of the defaulting tenant.

In Alaska, absent a special agreement of the parties, a leasehold interest in land can be terminated prematurely only by judicial decree in a statutory action. AS 09.45.690 provides:

"Unless otherwise provided in the lease, a landlord has a right to re-enter leased premises when a tenant fails to pay rent, and may bring action to recover the possession of the premises and the action is equivalent to a demand of the rent. If, at any time before judgment, the lessee or his successor in interest pays the amount of rent in arrears with interest and costs of the action and performs the other covenants or agreements, he is entitled to continue in possession unless otherwise provided in the lease."

Lessors did not follow this statutory procedure. Instead they brought an action in the district court for forcible entry and detainer, and received a judgment for possession and for rent due. The possession aspect of that judgment was later set aside on review by the superior court. We think the superior court was correct in its holding. The jurisdiction of the district court, at the time in question, was limited by the following statutory language:

"All actions in ejectment or for the recovery of the possession of, quieting title to, for the partition of or enforcement of liens upon, real property shall be started in the superior court in the judicial district in which the real property, or any part of it affected by the action, is situated." AS 22.10.030.

Lessors complain that the superior court erred in holding that the security deposit of $4,454, held by lessors, was available to make good the failures of the lessees to pay rent and the other breaches of covenant by lessees. The lease provided that the security deposit was for the purpose of assuring the full and faithful performance of the terms and conditions of the lease, "and not as advance rental." It also provided: "said sum to be forfeited, should lessees default in their obligations hereunder."

The superior court held that the existence of the security deposit in effect excused

certain defaults by the lessees.[3] But we do not need to reach this issue. We view the holding of the superior court as alternative to the critical decision that the lessors had not effectively brought about a termination of the lease by bringing the necessary statutory proceeding under AS 09.45.690. We need not pass upon the effect of the security deposit in curing lessees' breach.

One minor matter remains. The court below determined that lessors were not entitled to interest and costs on the rentals decreed due them by the district court. The reasoning of the superior court was that lessors had the use of the money which was being held by them as a security deposit. Both parties agree that the court erred by not including in the amount due the Petersons these sums. We remand this case to the court below with instructions to enter an amended judgment accordingly.

Reversed and remanded for proceedings in accordance with this opinion.

BONEY, C. J., and ERWIN, J., not participating.

---

3. We recognize that there is authority holding that such deposits, if reasonable in amount, will be regarded as "liquidated damages" and, therefore, the deposit cannot be applied to unpaid rent. Central Trust Co. v. Wolf, 255 Mich. 8, 237 N.W. 29 (1931). There is, of course, substantial authority that security deposits like the one here cannot be forfeited for lessees' breach but must be treated as an indemnity fund, from which the lessor must deduct his actual damages, the remainder to be returned to the lessee. Chaude v. Shepard, 122 N.Y. 397, 25 N.E. 358 (1890); Peirson v. Lloyd's First Mortgage Co., 260 N.Y. 214, 183 N.E. 368 (1932); 2 R. Powell, Property, Secs. 231[2], 273–276 (1967).