**DILLINGHAM COMMERCIAL COMPANY, INC., Appellant and Cross-Appellee,**

v.

**Virgina SPEARS, Jan T. Dickey, Dwayne Reed Dickey, a/k/a D. Reed Dickey, Jane Doe I, and John Doe I, Appellees and Cross-Appellants.**

Nos. 5273, 5301.

Supreme Court of Alaska.

Feb. 19, 1982.

John B. Patterson and John R. Strachan, Anchorage, for appellant and cross-appellee.

Henry J. Camarot, Camarot, Sandberg, & Hunter, Anchorage, for appellees and cross-appellants.

Before RABINOWITZ, C.J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This appeal arises from a summary judgment entered by the superior court in favor of Dillingham Commercial Company. The summary judgment decreed specific performance of a purchase option given to Dillingham in a lease between Dillingham and Virginia Spears. In addition, the superior court ordered that Dillingham pay Spears $20,016.50 in interest on the purchase price, and $6,000 for fire insurance premiums (including interest) paid by Spears. The court awarded Dillingham attorney's fees of $6,710 and costs in the amount of $1,737.52 as prevailing party on the main issues.

All of the above aspects of the superior court's decision are challenged on appeal and cross-appeal. Spears argues that summary judgment should not have been granted in Dillingham's favor but in her favor. In the alternative, she argues that the case was inappropriate for summary disposition and should have gone to trial. Dillingham asserts that it should not have to pay interest on the option purchase price, and should not be required to reimburse Spears for fire insurance premiums. Finally, Dillingham maintains that the award of attorney's fees by the superior court was so inadequate that it constituted an abuse of discretion.

On January 15, 1967, an earnest money agreement was entered into by Virginia Spears and Dillingham's predecessor in interest. The agreement provided for the sale of Spears' general store business, a ten-year lease on the property, and an option to purchase the property during the term of the lease. On March 1, 1967, a lease was entered into between Spears and Dillingham's predecessor in accordance with the terms of the earnest money agreement, for a term of ten years. The rent on the property was set at $600 per month, to be paid on the first day of each month. In addition, the lease provided that "[t]he Tenant shall also pay any and all taxes and assessments whether city, borough, state or federal on the premises during the term of this lease." The lease contained an option to purchase granted to the lessee for the term of the lease as long as the lease was not in default. As a condition to exercise of the option the tenant was required to pay Spears $20,000. The total purchase price of the property was set at $79,800. If the tenant wished to exercise its option, it was required to inform Spears one month in advance by mailed notice.

Dillingham was assigned the lease by its prime incorporator only months after the prime incorporator took possession under the lease in March 1967. The assignment was approved by Spears. As of March 1976, Dillingham had been in possession of the premises for nine years.

On March 22, 1976, Dillingham notified Spears of its intention to exercise its option to purchase the leased property, and offered to pay the $20,000 required by the lease on May 1, 1976. This offer came in the midst of a disagreement between Spears and Dillingham concerning the latter's failure to keep up with the taxes on the property, and

other defaults under the lease. Since the details of this disagreement comprise the factual background of the lawsuit, its history will be recounted at some length.

The dispute dated back some months to October 23, 1975, when Spears first wrote to Dillingham complaining that taxes were due on the property to the City of Dillingham (City) for the years of 1968 to 1974. Sometime between June 1974 and October 1975, Spears had received a copy of a June 30, 1974 letter from the City Manager of the City of Dillingham stating that personal property taxes, penalty, and interest from the years 1967 to 1974 were due in the amount of $7,174.86, and that real property taxes, penalty, and interest for the same years were due in the amount of $9,064.75. In her October 23, 1975 letter to Dillingham, Spears threatened foreclosure on the lease unless Dillingham made arrangements to pay the taxes within ten days. On November 3, 1975, Dillingham paid the City $16,239.61 for taxes, penalty and interest. On November 14, 1975, the City acknowledged the payment, but notified Dillingham that it still owed the City $1,161.86 in interest on the overdue real property taxes, $50 in foreclosure costs, and $2,780.07 in personal property taxes and interest. The City told Dillingham that it must make the payments of $1,161.86 and $50 or else the City would proceed with foreclosure. In addition, the City notified Dillingham that real property taxes for 1975 were also delinquent, although it made no request for payment.

Spears received a copy of the City's November 14 letter to Dillingham acknowledging partial payment of the taxes, and did nothing further until March 9, 1976, when Spears wrote Dillingham concerning the following claimed defaults under the lease: (1) Dillingham owed property taxes to the

City, (2) Dillingham had not provided insurance on the property and had not furnished a certificate of insurance to Mrs. Spears,[1] (3) rent payments were not being made in a timely fashion.[2] Once again, Spears gave Dillingham ten days to cure all breaches, after which Spears said she would foreclose upon the lease.

Within two weeks of receiving this letter, on March 22, 1976, Dillingham wrote to Spears stating for the first time its intention to exercise the purchase option, and offered to make the $20,000 downpayment as required by the lease on May 1, 1976. On April 8, Spears wrote Dillingham that it could not exercise the option "unless and until" all defaults were cured. Dillingham replied on April 22 that unless Spears moved forward under the option agreement within "a reasonable period of time," it would go to court to compel specific performance of the agreement.

On May 12, 1976, the City notified Dillingham that, unless the delinquent real property taxes for 1975 were paid by May 25, 1976, the City would commence foreclosure proceedings. The amount due was $3,210.95.[3] On June 18, 1976, Spears wrote Dillingham purporting to terminate the lease for Dillingham's failure to pay real estate taxes, and "specifically terminating that provision regarding an option to purchase." Attached to the letter was a "NOTICE OF TERMINATION OF LEASE ON DEFAULT," which also cited nonpayment of real property taxes as the reason for termination. On June 22, Spears paid the City $4,391.32 for 1974 and 1975 real property taxes.

On July 16, 1976, Dillingham paid $2,738.31 in real property taxes for 1976 and $4,467.17, clearing the personal property tax liability through 1976. On July 20, Dillingham wrote to Spears and tendered payment

---

1. Paragraph 14 of the lease provided that the tenant would obtain worker's compensation and liability insurance, and would furnish the landlord with the insurance certificates.

2. The trial court found that it was an undisputed fact that during the term of the lease almost every monthly rent payment had been made late.

3. This included the 1975 real property taxes, penalty, and interest. The May 12, 1976, notice did not include personal property taxes and interest payments on the 1974 taxes still owed to the City as of November 14, 1975.

of the $4,391.32 paid by Spears to the City plus interest. Spears refused on the ground that she considered the lease terminated, and stated that Dillingham would be permitted to remain on the premises for $1,200 per month, on a month-to-month basis. On August 12, 1976, Dillingham again tendered $4,413.27 to Spears to reimburse her for her tax payments to the City, and tendered two $600 checks for rent for July and August. In addition, Dillingham again notified Spears of its intent to exercise the purchase option of the lease and tendered immediate payment of the $20,000 sum as required by the lease. Spears did not alter her position that the lease had been terminated, and that Dillingham had no rights under the option provision. Dillingham then instituted action in superior court for specific performance of the option.

In this appeal, Spears contends that the superior court's grant of summary judgment in favor of Dillingham was erroneous on the following grounds: (1) Dillingham's purported exercise of the purchase option was ineffective because Spears had terminated the lease prior to Dillingham's attempted exercise of the option, and (2) Dillingham's attempted exercise was not effective because Dillingham had defaulted under the lease, and the lease provided that the option could not be exercised if the lease was in default, or if the tenant had failed to abide by its terms up to the time of exercise. In the alternative, Spears contends that the terms of the option contract were in doubt and therefore a trial should have been held to determine whether there was an enforceable option agreement.[4]

## DILLINGHAM'S RIGHT TO EXERCISE ITS PURCHASE OPTION ON AUGUST 17, 1976.

■ Spears makes the initial argument that Dillingham's rights under the option provision were extinguished as a result of the termination notice she gave to it on June 18, 1976. Spears' position is that if there was no longer a lease, the purchase option contained therein was extinguished. Thus, the point of contention is whether there was a valid termination by Spears of the lease.

Spears contends that, under the terms of the lease, the landlord has the right to terminate the lease by providing written notice to the tenant. Two paragraphs are cited as sources of this purported authority. Paragraph 18 of the lease provides:

> [The] Landlord shall, in the event of default, have all the remedies provided by Alaska Statute and by common law including the right of distraint.

Paragraph 16 provides:

> At the termination of this lease by lapse of time or otherwise, Tenant shall yield immediate possession to Landlord, and if he fails to do so shall pay to Landlord as liquidated damages for each day of the whole time that such possession is withheld a sum equal to one-fifteenth of the monthly rent provided for herein. The provisions contained in this paragraph shall not be construed as a waiver by Landlord of any right of re-entry and neither the receipt of the sum aforesaid nor any act of apparent affirmance of the tenancy shall operate as a waiver of Landlord's rights hereunder, including Landlord's privilege to terminate this lease. If for any reason such holding over is construed as a tenancy, the same shall be of the Month-to-Month variety.

With regard to Paragraph 18, the "remedy" provided by Alaska Statute, AS 09.45.690,[5]

---

4. As was mentioned at the outset, Dillingham in its appeal argues that it should not have been required to pay interest on the purchase price from the time of its August 12, 1976, tender of the downpayment under the lease. Dillingham also argues that the superior court's award of attorney's fees was manifestly unreasonable.

5. AS 09.45.690 provides:

> *Failure to pay rent.* Unless otherwise provided in the lease, a landlord has a right to re-enter leased premises when a tenant fails to pay rent, and may bring action to recover the possession of the premises and the action is equivalent to a demand of the rent. If, at any time before judgment, the lessee or his successor in interest pays the amount of rent in arrears with interest and costs of the ac-

and common law, *Klinger v. Peterson*, 486 P.2d 373, 378 (Alaska 1971), is that of judicial foreclosure. In *Klinger*, we held that, "[i]n Alaska, absent a special agreement of the parties, a leasehold interest in land can be terminated prematurely only by judicial decree in a statutory action." 486 P.2d at 378. Paragraph 18 cannot by itself provide the landlord with the right to terminate by notice. We must look to Paragraph 16 to determine whether it supplies the "special agreement" contemplated by *Klinger*.

We think it is apparent that no special agreement regarding termination by notice is provided for in Paragraph 16. Spears emphasizes the language "the termination of this lease by lapse of time or *otherwise*" and "landlord's privilege to terminate this lease." She claims that these references establish the right to terminate by notice. The word "otherwise" in the first sentence of Paragraph 16 is most plausibly read as referring to a judicial decree of termination. The second sentence of Paragraph 16, which speaks of "landlord's privilege to ter-minate this lease," when read in full, is not a grant of rights to the landlord, but simply provides that certain of the landlord's existing rights should not be considered waived.

The superior court concluded that "it is . . . an undisputed fact that the lease does not contain any express provisions which permit it to be terminated on account of a breach, whether material or otherwise, of any of its covenants or conditions." We hold that the superior court correctly determined this question in ruling that Spears had not validly terminated the lease prior to Dillingham's attempt to exercise its rights under the purchase option agreement.

Spears makes the additional argument that, even if the June 18, 1976, notice of termination sent to Dillingham was ineffective, Dillingham's breaches or defaults under the lease nullified its right to purchase under the option.[6] The major default alleged is Dillingham's failure to pay property taxes. Other alleged defaults were that

tion and performs the other covenants or agreements, he is entitled to continue in possession unless otherwise provided in the lease.

On its terms, the statute deals only with a situation where the lessee has failed to pay rent. *Klinger v. Peterson*, 486 P.2d 373, 378 (Alaska 1971), takes the view that a proper statutory action must be brought by the landlord to terminate a tenant's leasehold interest in land. Although the lessee in this case is accused of breaches and defaults in addition to the failure to pay rent, it is clear that Spears did not institute statutory action addressed to those additional transgressions.

6. Under this theory the lessee's rights under the purchase option expired even if the lease was otherwise still in effect. It is a different argument than used in *Klinger*, where the only way to terminate the tenant's purchase-option rights was through the termination of the lease as a whole. In *Klinger*, there were no conditions attached to the tenant's ability to exercise the purchase option in the terms of the lease. The lease in the instant case has an express provision that the option may be exercised only if the lease is not in default.

Paragraphs 18 and 19 have to do with default and with the effect of default on the tenant's ability to exercise the purchase option. Paragraph 18 provides in part:

18. DEFAULT. Any of the following shall constitute a default hereunder by Tenant:

A. Failure to perform the covenant contained herein for the payment of rent.

B. Failure to perform or fulfill any other covenant or condition contained herein.

. . . .

Failure to perform a convenant or fulfill a condition contained herein shall constitute a default regardless whether other consequences of such failure are provided for herein, as in the case where an assignment without consent is void. Landlord shall, in the event of default, have all the remedies provided by Alaska Statute and by common law including the right of distraint.

Paragraph 19 of the lease provides in part:

19. OPTION TO PURCHASE. The Landlord hereby grants unto the Tenant the right, option, and privilege to purchase the leased premises during the term of this lease for the following amounts and the following conditions:

A. That this lease is not in default.

. . . .

The exercise of the option to purchase is conditional on the lease herein not having been terminated and on condition that the Tenant has observed and complied with the covenants, terms and conditions devolving upon the Tenant, up to the time of the exercise of option and the payment of such purchase price thereof, in the manner herein provided.

Dillingham (1) had failed to pay the rents on time and was in default as to two monthly payments at the time the superior court entered summary judgment in favor of Dillingham, (2) had subleased or allowed the use of the property without the written consent of the landlord, and (3) had failed to provide the insurance or insurance policies to the landlord as required.

## FAILURE TO PAY TAXES

■ Paragraph 2 of the lease provides that "[t]he Tenant shall also pay any and all taxes and assessments whether city, borough, state or federal, on the premises during the term of this lease." There is no question that at the time Dillingham first notified Spears that it intended to exercise its purchase option, on March 22, 1976, it was delinquent in its tax payments. On August 12, 1976, when Dillingham made its second statement of intent to exercise the option, and tendered the $20,000 down payment, all of the tax payments had been made to the City, although Spears herself had made one payment of $4,319.32. At the same time that Dillingham tendered the downpayment, it also tendered $4,413.27 to Spears to reimburse her for her expenditures.

The superior court's resolution of the tax-default issue was based upon perceived equitable considerations. The superior court applied equitable principles against forfeitures, and found that Dillingham's defaults were not serious enough to warrant loss of rights under the purchase option:

First of all, with regard to late payment of taxes, the fact of the matter is that the taxes were paid, and they were substantial amounts, they were large amounts of money. The fact also remains that the Plaintiff had paid a large sum of money in lease payments prior to that time, in fact the lease was nearing the end of its term. Under those circumstances, I believe it would be highly inequitable for this Court to declare a forfeiture of the purchase option and preclude the Plaintiff from proceeding with the purchase of the property on the agreed terms.

In the case at bar, we think it was entirely appropriate for the superior court to have weighed the equities in determining whether Dillingham's rights under the purchase option provisions of the lease should have been forfeited. The appropriateness of the superior court's approach is confirmed by our opinion in *Hendrickson v. Freericks*, 620 P.2d 205, 212 (Alaska 1980). There the lessor sought to terminate the lessee's interests in a lease for an alleged breach by the latter of the lease provisions relating to assignments. We stated:

Hendrickson contends that having established a material breach on the part of the lessees, he should now be permitted to terminate the lease. Although forfeitures for breach of assignment have been approved if authorized by the language in the lease, 'forfeitures are not favored and never enforced in equity unless the right thereto is so clear as to permit no denial.' *Shoemaker v. Shaug*, 5 Wash.App. 700, 490 P.2d 439, 441 (1971), *quoting John R. Hansen, Inc. v. Pacific International Corp.*, 76 Wash.2d 220, 228, 455 P.2d 946, 951 (1969). Equity's goal is to do substantial justice to both parties, and where no injustice would be visited upon the injured party, equity will award him compensation rather than decree a forfeiture against the offending party. *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 575 P.2d 869, 876 (1978). In determining whether forfeiture is required, the trial court is vested with broad discretion. The court must weigh the equities and 'fashion a decree to meet the requirements of the situation and to conserve the equities of the parties.' *Id.*, 575 P.2d at 876 (citation omitted). The factor which has often been of greatest importance to the court in determining whether a forfeiture should be ordered is the financial loss suffered by the parties. *See State ex rel. Foley v. Superior Court*, 57 Wash.2d 571, 358 P.2d 550, 552 (1961). Where severe financial loss would be incurred by the lessee, the courts have been less likely to order forfeiture of the lease. *Shoemaker v. Shaug*, 490 P.2d at 441 (1971).

Additionally, this court's decisions in the area of installment contracts for the sale of land are relevant.[7] In *Curry v. Tucker*, 616 P.2d 8, 13 (Alaska 1980), we upheld the trial court's forfeiture of vendee's right under an installment land contract, although that we did so under "extreme circumstances."

The issue thus becomes whether the trial court's application of the extreme remedy of forfeiture was justified. It is well settled in this jurisdiction that equity abhors a forfeiture and that when the principles of equity and justice so require, a court may, in its sound discretion, refuse to enforce a forfeiture provision in a land sale contract. *Moran v. Holman*, 501 P.2d 769, 771 (Alaska 1972); *McCormick v. Grove*, 495 P.2d 1268, 1269 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68, 74 (Alaska 1964). The trial court's decision in such circumstances will not be set aside unless it is against the clear weight of the evidence. *Moran v. Holman*, 501 P.2d at 771; *Jameson v. Wurtz*, 396 P.2d at 74.

In the instant case, we cannot conclude that the superior court's refusal to forfeit Dillingham's right under the purchase option agreement is against the clear weight of the evidence. Dillingham's late payment of taxes did not warrant forfeiture of its purchase option rights under the lease.

## LATE RENT PAYMENTS

The superior court found that "practically every, if not every rent payment, was made late." There were two reasons, according to the court, why this history did not warrant a "forfeiture" of the tenant's rights under the purchase option. First, Spears accepted every late payment without objection, and did not object until the time that Dillingham sought to exercise the purchase option. The superior court considered Spears' long acquiescence as a waiver of her right to claim default for late rent payments. Second, the trial court interpreted Alaska precedent as disfavoring forfeiture of rights in purchase options.[8]

In regard to the first rationale employed by the superior court, the lease contained a "non-waiver" clause, which provided that:

No waiver by Landlord of any default shall operate as a waiver of any other default or of a like default on a future occasion. Only waivers in writing executed by Landlord shall be effective. No delay or omission on the part of Landlord in exercising any of its rights shall operate as a waiver of such right or any other right.[9]

Literally applied, this "non-waiver" clause would permit the landlord to accept late payment and still assert default of the lease unless she waived such default in writing. However, "such a nonwaiver clause will not, in all circumstances, foreclose the lessor from waiving a forfeiture based on past breaches." *Summa Corporation v. Richardson*, 93 Nev. 228, 564 P.2d 181, 185 (1977). *See also Gonsalves v. Gilbert*, 44 Haw. 543, 356 P.2d 379, 384 (1960). After years of accepting late rental payments she cannot claim that the default attending such late payment excuses her from performing un-

---

7. There is a distinction between the rights implicated here. The purchaser under an installment land contract is treated as the equitable owner and the vendor as holding the bare legal title merely as security for the purchase price. *Ward v. Union Bond & Trust Co.*, 243 F.2d 476, 478 n.3 (9th Cir. 1957). *See also Jenkins v. Wise*, 58 Haw. 592, 574 P.2d 1337 (1978). In contrast, an optionee under a purchase option holds only a contractual right to the land. *County of San Diego v. Miller*, 13 Cal.3d 684, 119 Cal.Rptr. 491, 493, 532 P.2d 139, 141 (1975).

In our view, the contrasting nature of the interests created under land sales contracts and option to purchase agreements should not result, in the context of this case, in differing treatment by the trial court in its application of equitable principles.

8. The trial judge said that, "I think because of the hardships a forfeiture would impose here, because of the strong policy in this state against allowing a forfeiture, that I really don't have my discretion under the precedents to do anything but relieve the Plaintiff of that—to relieve him of the forfeiture for late payment of rent, which for so long was not objected to."

9. Spears argues that this clause preserved her right to object to Dillingham's late payments, even though she had failed to object throughout her years of dealing with Dillingham under the lease. *See Stephens v. State*, 501 P.2d 759, 762 (Alaska 1972).

der the purchase option.[10] Thus, we hold that the superior court was correct in concluding that Spears' long acquiescence constituted a waiver of her right to claim a default for Dillingham's late payments of rent.

Furthermore, the equitable principles previously discussed support the superior court's determination that forfeiture of Dillingham's right under the purchase option was not warranted.[11] In the case at bar, the extreme remedy of forfeiture is an inappropriate form of relief for the mere late payment of rent, particularly where Spears failed to object to Dillingham's slowness over the course of nine years.[12]

## INCOMPLETE CONTRACT

Spears argues that, even if summary judgment in her favor is not warranted, the case should have gone to trial on the issue whether there was an enforceable contract of sale. Paragraph 19(C) of the lease provided that the tenant and landlord would "enter into a deed of trust transaction with related documents including a deed of trust note, for the sale of the premises" on or about March 1, 1967, and these would be placed in escrow with the National Bank of Alaska. These documents were never prepared or placed in escrow. Spears asserts that it "can ... be reasonably assumed" that there was no meeting of the minds between the parties concerning the terms of the sale.

In fashioning its decree of specific performance, the superior court set the terms for monthly payments and interest rate under the purchase option in accordance with

---

**10.** The court in *Summa Corporation v. Richardson*, 93 Nev. 228, 564 P.2d 181, 185 (1977), refused to enforce a non-waiver clause, where the lessor's acquiescence "lulled [lessee] into inaction". The pertinent facts of *Summa* are close to those in the instant case:

> Here, respondents recognized the validity of the lease, accepted rents with no expression of intent to stand on any legal rights they may have had because of Summa's prior breaches, made no demand on Summa to remedy them, and otherwise lulled Summa into inaction. Only after Summa's exercise of the option did respondents seize upon the breaches as a means to establish Summa's forfeiture of the privilege to exercise. Under such circumstances, respondents, by their conduct, waived any right to assert forfeiture for Summa's infractions of the lease prior to exercising the options.

**11.** Spears also argues that "at least two or three" of the monthly payments were never made at all. The superior court found that it was an undisputed fact that all but perhaps two months' rent had been paid. Viewing the facts most favorably to Spears, we must assume that two months' rent had gone unpaid. The superior court ruled that, even if Dillingham was in arrears to that extent, it was not a sufficiently substantial default to warrant loss of rights under the option agreement:

> I simply believe that in the context of the large amounts of money which were paid out by the Plaintiff under this lease and under— and with respect to the taxes, that the nonpayment of two months' rent, which went unobjected for so long, is simply not sufficient justification to impose the forfeiture which the Defendants seek to impose.

We sustain the superior court's substantiality ruling. Under the principles discussed regarding Dillingham's nonpayment of taxes and late payment of rent, we conclude that the superior court correctly ruled that Dillingham's failure to pay the two month's rent did not justify forfeiture of Dillingham's rights under the option agreement. *Vozar v. Francis*, 579 P.2d 1056, 1058 (Alaska 1978).

**12.** As indicated earlier, Spears also claims that Dillingham lost its rights under the lease because of its defaults in subleasing the premises without Spears' consent and in failing to provide insurance as required by the lease. Neither of these alleged defaults, raised by Spears at trial, is discussed in the argument section of her brief. Rather, she makes only general references that "the tenant failed to comply with several of the covenants, terms and conditions [of the lease]." She does not respond to the superior court's reasoning in disposing of the sublease and insurance claims. In this context, we hold that, since these points are not briefed, Spears has waived them. *Wren v. State*, 577 P.2d 235 (Alaska 1978); *Wetzler v. Wetzler*, 570 P.2d 741 (Alaska 1977).

We further note that the superior court disposed of both issues together. First, it found that both grounds had been abandoned by Spears during a previous summary judgment argument. Second, the superior court did not consider the breaches serious enough to justify forfeiture. Third, the court concluded that both breaches could be cured through the payment of money to Spears, and that this remedy was preferable to forfeiture.

those provided in the original earnest money agreement which preceded the signing of the lease. The superior court stated that Spears had introduced "[n]o contrary evidence whatsoever ... that the earnest money provisions, to the extent that they do not conflict with those provisions set forth in the lease, are to be regarded as part and parcel of the parties' total agreement." The superior court therefore found that "it is undisputed from the evidentiary standpoint that the earnest money agreement is to be read into the lease option." We find no error in these rulings.[13]

We now turn to Dillingham's appeal. Dillingham argues two points. First, it asserts that the superior court abused its discretion in awarding inadequate attorney's fees. Second, it contends that it should not have to pay interest on the option purchase price.[14]

## ATTORNEY'S FEES

■ Dillingham argues that the trial court's award of attorney's fees in the amount of $6,710 was manifestly unreasonable. The superior court apparently arrived at this amount by applying the fee schedule of Civil Rule 82(a) for cases disposed without trial as though Dillingham had prevailed recovering a money judgment of $79,800. ($79,800 was the purchase price of the property under the option provision of the lease.) Dillingham argues that $79,800 was an incorrect amount with which to calculate the Rule 82 award, because "everyone knows" the property was worth much more. The 1978 tax assessment placed the value of the property at $262,900.

Our review of the case has persuaded us that although the superior court erred in its resort to the schedule of attorney's fees provided for in Civil Rule 82(a)(1)[15] its award was not a clear abuse of the discretion vested in trial courts in such matters.[16] Since we are of the view that the $6,710 attorney's fees was reasonable, no purpose would be served by a remand for reconsideration of attorney's fees under the appropriate decision of Civil Rule 82. A proper result will not be disturbed on appeal regardless of the reasoning employed below.

13. Spears cites *Jackson v. White*, 556 P.2d 530, 532 (Alaska 1976), for the proposition that, "when the existence of a contract and the terms thereof are in issue, and the evidence is conflicting, it is for the trier of fact to determine whether the contract did in fact exist, and if so, the terms thereof." The quotation above cited actually begins: "Where the existence of an oral contract and the terms thereof are the points in issue ...." In short, *Jackson* is not supportive of Spears' claim that the lawsuit should have gone to trial. In the present case, there is no question about the existence of a contract between the parties or about the terms of the contract. There is no issue of fact still to be resolved in connection with the agreement.

14. Although Dillingham, in its opening brief, argued that the superior court was "clearly erroneous" in requiring it to reimburse Spears for $6,000 she had paid in fire insurance premiums Dillingham has abandoned that position in its reply brief and at oral argument. Dillingham no longer advances an argument with respect to the fire insurance premiums, and instead requests that an "adjustment be made in the area of interest it must pay as balances due on the purchase price."

15. Civil Rule 82(a)(1) and (2) read as follows:
   (a) *Allowance to Prevailing Party as Costs.*

(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as party of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

|  | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

   Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.
   (2) In actions where the money judgment is not an accurate criteria for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

16. Resort to the schedule of attorney's fees set forth in Civil Rule 82(a)(1) was inappropriate since Dillingham did not receive a money judgment.

*Davis v. Hallett,* 587 P.2d 1170, 1171 (Alaska 1978).[17]

INTEREST ·

The superior court entered judgment for specific performance in favor of Dillingham, and additionally ruled that Dillingham must pay Spears $20,016.50 in interest on the full purchase price of $79,800, dating from August 21, 1976. Dillingham argues that this portion of the superior court's decree was clearly erroneous, because it tendered performance under the option on August 12, 1976. According to Dillingham, Spears' refusal of its tender prevented the accrual of interest. In the alternative, Dillingham argues that it has made 43 payments of $600 into a trust fund as ordered by Superior Court Judge Occhipinti, and that these payments should be included in the calculation to determine the interest due.

■ Both Dillingham and Spears agree upon the general rule which applies to this facet of the case:

The general rule is that from the time when a contract of sale of land should be performed the land is in equity the property of the vendee held by the vendor in trust for him, and the purchase price is the property of the vendor held in trust for him by the vendee, and that upon specific performance the vendor is liable to account for the rents and profits and the vendee for the interest on the purchase price.

*Russell v. Western Nebraska Rest Home, Inc.,* 180 Neb. 728, 144 N.W.2d 728, 733 (1966). When performance under the contract is delayed due to acts of the vendor, the purchaser is entitled to the rents and profits from the time when possession should have been delivered, and the vendor is entitled to a credit for interest on the unpaid purchase money.[18]

The rationale behind the rule is that, since this court is attempting to enforce the contract as written, it will attempt to place the parties in the position they would have been in had the contract been performed in a timely manner. *Eliason v. Watts,* 615 P.2d 427, 430 (Utah 1980); *Ellis v. Mihelis,* 60 Cal.2d 206, 32 Cal.Rptr. 415, 423, 384 P.2d 7, 15 (1963); *Re v. Wells Fargo Bank,* 269 Cal.App.2d 783, 75 Cal.Rptr. 367, 371 (1969); *Smith v. Owens,* 397 P.2d 673, 679–80 (Okl. 1963); Annot., 7 A.L.R.2d 1204, 1222 (1949).

The guiding principle with respect to the calculation of the damages incident to the decree of specific performance, as we have seen, is to relate the performance back to the date set in the contract. Timely performance of the contract would result in the purchaser receiving the rents and profits of the land but being denied the use of the purchase money, and a purchaser who seeks to recover rents and profits must permit an offset for his use of the purchase funds during the period that performance was delayed.

*Ellis v. Mihelis,* 32 Cal.Rptr. at 423, 384 P.2d at 15.

■ In this case, Dillingham was never out of possession of the property, so it has effectively enjoyed the "rents and profits" it would be entitled to receive under the *Lockhart* rule. Where the vendee has retained possession, courts have held that the vendor is entitled to interest on the unpaid purchase money, even if the delay in performance of the contract is attributable to the vendor.[19]

17. As we stated in *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970), unless the superior court's award of attorney's fees is manifestly unreasonable, there is no abuse of discretion.

18. *TriState Mall Assoc. v. A.A.R. Realty Corp.,* 298 A.2d 368, 371 (Del.Ch.1972). *See also* the cases cited in Annot., 7 A.L.R.2d 1204, 1222 (1949) ("The question whether a mere tender of the purchase money by the purchaser, the vendor being in default, will relieve the purchaser from liability to credit the vendor with interest, must be answered in the negative except in unusual situations.") This court has endorsed the above rule in *Lewis v. Lockhart,* 379 P.2d 618, 624 (Alaska 1963).

19. *Kubnick v. Bohne,* 56 Wis.2d 527, 202 N.W.2d 400 (1972); *Lund v. Larsen,* 222 Minn. 438, 24 N.W.2d 827 (1946); *Volk v. Atlantic Acceptance & Realty Co.,* 142 N.J. Eq. 67, 59 A.2d 387 (1948); *Asbury v. Cochran,* 243 Ala. 281, 9 So.2d 887 (1942). The theory behind this rule is that "neither party should enjoy the

Dillingham does not argue that the *Lockhart* rule is inapposite to the present case, but contends that the rule should not be "blindly applied" irrespective of the vendor's fault in wrongfully refusing Dillingham's repeated tender. In *Lockhart* the vendors "wrongfully took possession of the leased premises ... [and had] wrongfully retained possession ever since." 379 P.2d at 624. Even so, they were entitled to interest on the purchase price so long as the purchasers pressed their claim for the rental value of the property during the time they were deprived of possession.[20] Here, Dillingham was not forced to leave the property and Spears' actions do not justify loss of her rights to interest on the purchase price.[21]

AFFIRMED.

---

possession and use of the subject-matter of the contract and also the purchase money." Annot., 75 A.L.R. 316, 317 (1931). *See also* Annot., 25 A.L.R.2d 951 (1952).

See *Amoss v. Bennion*, 23 Utah 2d 40, 456 P.2d 172, 174 (1969) (purchaser must pay interest on purchase price from date of tender where he has enjoyed possession of the property).

**20.** *Eliason v. Watts*, 615 P.2d 427 (Utah 1980), is helpful precedent in considering Dillingham's claim that Spears should not receive interest on the purchase price because her refusal to perform was wrongful.

In the present case, defendant's refusal to convey the property was found to be "wrongful in that it was in contravention of the contract but it was not willful or malicious so as to entitle plaintiffs to punitive damages." The usual rule of credit for purchase money interest against rental value should therefore be followed in adjusting the equities between the parties based upon their position had there been a timely conveyance. *Id.* at 431. Under the *Eliason* standard, Spears' failure to accept Dillingham's tenders of performance would have had to have been "willful or malicious" in order to forfeit her equitable claim to interest or the purchase price. *Kreider v. Brubaker*, 371 Pa. 279, 89 A.2d 502, 504 (1952), held that a vendee in possession might

escape liability for interest on unpaid purchase money if "the vendor is guilty of willful delay or gross laches in carrying out the agreement and the purchase money is appropriated and lies unproductive to vendee."

**21.** Dillingham further argues that it should receive credit for the monthly payments of $600 it has been making into a trust fund for 43 months pursuant to court order. Essentially, Dillingham's argument is that it should not be required to pay interest on money it did not have in its possession.

From the record we have, it is unclear whether the monthly payments were intended to be installments on the purchase price. There is no question that the payments were not the equivalent of full performance under the option agreement, which required, at least, a downpayment of $20,000 for Dillingham to exercise its option. The most plausible explanation is that the purpose of these payments was to require Dillingham to continue making rental payments under the term of the original lease so long as it remained in possession, pending the outcome of the litigation. Thus, the accumulated $25,800 does not represent a frozen tender of purchase money, and would provide no deduction against the interest amount due Spears.