Donald L. NORTON, a/k/a D.L.
Norton, Appellant,

v.

Carol HERRON, Appellee.

No. 7197.

Supreme Court of Alaska.

Jan. 27, 1984.

Michelle V. Minor, Anchorage, for appellant.

Doris Loennig, P.C., Fairbanks, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

Appellant Donald L. Norton, the owner of a house located in Fairbanks, Alaska, and appellee Carol Herron, a prospective buyer, entered into an agreement in May 1980 for the sale of Norton's home. However, upon tender of the down payment by Herron in May 1981, Norton refused to perform, alleging that Herron was in default under the terms of the agreement. Shortly thereafter, Herron brought suit for specific performance. After denying the parties' cross-motions for summary judgment, the superior court granted Herron's second motion for summary judgment ordering specific performance of the agreement. Norton appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In late April 1980, Herron met with Norton for the first time to discuss the purchase and sale of the property. However, they were unable to agree on a price at that time. Approximately one week later, Herron contacted Norton and said she would agree to his price of $87,500.00. Norton then arranged through Mark Evans, the Fairbanks Branch Manager of the Transamerica Title Company ("Transamerica"), to have Transamerica draw up the purchase and sale agreement. Central to this controversy are not only the terms eventually agreed upon, but the circumstances under which the parties reached the agreement. Herron had indicated to Norton at the initial meeting that she had "property" in Montana that was on the market. Norton testified at deposition that Herron told him that she expected the proceeds from the sale of the land to generate "some $17,000.00 cash to her." These statements would later be the primary cause of this dispute.

On May 2, 1980, Norton and Herron again met, this time at Evans' office in Fairbanks. After the meeting, Evans proceeded to draft buyers' and sellers' escrow instructions ("the agreement") based on notes that he had taken during the meeting. The agreement provided for Herron to purchase the house for a total price of $87,500.00, payable as follows: $200.00 earnest money to be paid on or before May 15, 1980, into an escrow established at Transamerica; approximately $17,000.00 to be paid at the date of closing; and $70,500.00 in the form of a "wrap-around" deed of trust[1] payable with interest in monthly installments of $544.00 and a balloon payment of $3,000.00 due one year after the

1. Black's Law Dictionary defines "wrap-around mortgage" as: "A second mortgage which wraps around or exists in addition to a first or other mortgages. Form of secondary financing typically used on older properties having first mortgages with low interest rates...." Black's Law Dictionary 1441 (5th ed. 1979). The record reflects that Norton secured future payments from Herron by having this "wrap-around" deed of trust while still remaining obligated himself to pay off the original deed of trust/mortgage.

date of closing.[2] The agreement was signed separately by the parties on or about May 5, 1980.

The terms of the agreement at issue involve the clause pertaining to the cash at closing. It reads:

> The cash down at closing (approx. $17,000.00) is to come from the proceeds of the buyer's property in Montana which is on the market to be sold at this time. The buyer is required to submit to this escrow instructions from the Montana transaction authorizing all of her proceeds to be made payable to this escrow. It is agreed that the closing of this escrow shall be within 30 days after the closing of the Montana transaction, but no later than May 15, 1981.

In August 1980, one of Herron's two parcels in Montana was sold. The sale failed to raise $17,000.00, and Herron did not notify Norton of the Montana sale at that time.[3]

On May 14, 1981, Herron tendered $17,000.00 into the escrow established at Transamerica. However, Evans informed her that under the terms of the agreement certain other items would be required before closing could occur.[4] On May 15, 1981, the last possible day of performance, Norton's attorney, Ronald Bliss, wrote to Transamerica, requesting that Norton's deed be returned since he considered Herron in default. Bliss based the letter on the following grounds: First, Herron's failure to forward the escrow agreement from the Montana transaction; second, Herron's failure to direct the proceeds from that sale into the escrow; and third, that closing had not occurred within the agreed time period following the closing of the Montana property and could not occur by May 15, 1981. Herron then filed suit August 18, 1981, seeking specific performance of the agreement.

## II. HERRON'S MOTION FOR SUMMARY JUDGMENT

Norton appeals, contending the agreement made it a condition precedent for Herron to sell her "Montana property" and forward proceeds of the sale into the escrow established at Transamerica. Herron argues that there was no such intention; rather, she claims that the source of the funds was immaterial provided she perform by tendering $17,000.00.

Norton first asserts that there is a genuine issue of fact relating to the cash to be paid at closing by Herron, thereby making summary judgment for Herron inappropriate. Specifically, Norton claims that there is an issue of fact as to whether Herron's credit, based solely on her representation to Norton of her intention to sell the Montana property, was a material part of the parties' bargain. Norton argues that the superior court improperly resolved this issue in favor of Herron in that, by failing to forward the proceeds of the Montana transaction into the subject escrow, Herron did not conform to either the provisions of the parties' agreement or to the parties' intentions and understanding. Alternatively, Norton maintains that in order to have reached the conclusion that the sale agreement was enforceable, the superior court must have erroneously determined that the parties considered the source of the down payment immaterial.

Before addressing these issues, we find it appropriate to reiterate the court's method of analysis in a case such as this. We have recognized that "the primary underlying purpose of the law of

---

2. In addition, the parties agreed that Herron would furnish proof of binder for fire insurance coverage at the time of closing. Under the agreement, Herron took possession as a lessee on May 15, 1980. The terms of the rental agreement are not material to this controversy.

3. While the record reflects a conflict over whether Herron ever notified Norton of the sale, it is clear that Norton did not inform Herron that she was in default until May 15, 1981, despite telephone conversations and a visit with her.

4. Herron did not at any time before May 15, 1981, supply to Transamerica the insurance binder, the proof of payment for fuel oil, an executed deed of trust and note, information regarding property taxes, or the escrow instructions from the Montana transaction.

contracts is the attempted 'realization of reasonable expectations that have been induced by the making of a promise.'" *Stenehjem v. Kyn Jin Cho*, 631 P.2d 482, 484–85 (Alaska 1981), *quoting Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971), *quoting* 1 A. Corbin, Corbin on Contracts § 1, at 2 (1963) (footnote omitted). In order to give legal effect to the parties' reasonable expectations, the court must look first to the written agreement itself and also to extrinsic evidence regarding the parties' intent at the time the contract was made. *See generally Peterson v. Wirum*, 625 P.2d 866, 870–71 (Alaska 1981); *Wright v. Vickaryous*, 598 P.2d 490, 497 n. 22 (Alaska 1979).

■ As Norton suggests, since the extrinsic evidence is not in dispute, we are not limited to the "clearly erroneous" standard in our review of the superior court's decision to grant or deny summary judgment on the basis of its interpretation of a contract. In a case such as this, interpretation of a contract is treated in the same manner as a question of law. *See Wirum*, 625 P.2d at 871–72; *Wessels v. State, Department of Highways*, 562 P.2d 1042, 1046 n. 9 (Alaska 1977).

An examination of the paragraph in dispute shows two possible interpretations. Norton emphasizes that there is nothing ambiguous about the provision that Herron be required to pay the cash down at closing from the proceeds of the sale of her Montana property. Norton also contends that the parties' primary concern was not just that the $17,000.00 sum be paid at closing, but that the agreement reflect the parties' intention that the sale of the Montana property be a continuing source of funds for satisfaction of Herron's on-going obligation to Norton on the wrap-around deed of trust. Herron argues that her conduct affirms her understanding of the language that it was not the intent of the parties that the *source* of the money paid Norton be a condition precedent, and urges an examination of the extrinsic evidence as support for her claim.

The extrinsic evidence presented to the court included affidavits of Herron and Norton, and depositions of Norton and Evans with exhibits attached thereto. The affidavits of both Norton and Herron are nothing more than a restatement of their conflicting litigation positions and do not cast light on the circumstances at the time the contract was made. *See Wirum*, 625 P.2d at 870 n. 6. The remaining evidence which reflects upon the parties' intentions are the letter from Norton's counsel to Transamerica, dated May 15, 1981, which claims a default by Herron; the contract for deed for the Montana property between Herron and her buyers, Richard and Julie Richardson; and the depositions. While the question is close we conclude that this evidence reveals no genuine issue as to any material fact relevant to the resolution of the question at hand.

First, the agreement between Herron and the Richardsons provides that Herron agreed to "take so much of the monthly payment to be received from buyers as is necessary to make the required monthly payments under 'Herron's mortgage.'" This contract, executed in August 1980 does not evidence an understanding by Herron that the "source of funds" provision in the Herron/Norton agreement be a condition precedent. Second, the May 15, 1981 letter from Norton's attorney provides in relevant part:

The buyer is in breach under these instructions in that the required instructions from the Montana transaction have not been forwarded and accordingly, the proceeds were not forthcoming direct to this escrow. Also, closing has not occurred within the agreed time frame following the closing of the Montana property and cannot occur by May 15, 1981.

The language of this letter not only reflects an understanding by Norton that he knew of the closing of the Montana property before May 15, 1981, but also implies that if the proceeds had been forwarded after thirty days of the Montana sale, that would have been sufficient performance if the deal had closed by May 15, 1981. However, Norton did not intimate to Herron

that she was in breach until he requested that his deed be withdrawn from escrow on May 15, 1981.[5] Third, Norton's deposition also fails to establish the existence of a material issue as to the parties' intent. Rather, the deposition indicates that he was more concerned with the amount of the down payment, and not the source of it:

LOENNIG (Herron's attorney): All right. If you were looking for a qualified buyer then you were looking for one of two things, either somebody who could cash you out completely or somebody whose credit you could accept, is that a reasonable assumption?

NORTON: Well, I think you're missing quite a valid point and that's the amount of down payment consideration.

LOENNIG: Yes? And I've—I've invited you to tell me and you have not told me what those terms were?

NORTON: Mrs. Loennig, I don't recall conversations precisely. I know what I was looking for, I needed to—to get into a property in Anchorage and I needed cash to do that with, if somebody offered me $1,000 down and $150,000.00 I would have turned it down because it wouldn't have achieved what my objectives were.

. . . .

LOENNIG: Were you looking—since th-—did she—did Mrs. Herron indicate the total value of the Montana property?

NORTON: At no time.

LOENNIG: Did she indicate to you whether or not the Montana property was encumbered?

NORTON: She didn't indicate.

Norton points to the deposition testimony of Mark Evans as definitive of the parties' intentions. However, upon cross-examination by Herron's attorney, Evans' testimony [6] indicates that his knowledge of the parties' intent was more speculation than firsthand knowledge. Therefore, we are not persuaded that Evans' testimony is indicative of the parties' intent. Rather, the deposition testimony indicates that while Evans assumed that the parties expected that the proceeds from the sale of the Montana property would raise $17,000.00, his testimony sheds no light on what the parties contemplated in the event that the plaintiff failed to either generate $17,000.00 or succeeded in obtaining another form of financing to raise the money.

■ In our opinion, the admissible extrinsic evidence cited by the parties shows that the superior court's conclusion that the transfer of the proceeds from the Montana sale to the Transamerica escrow was not intended as a condition precedent should be affirmed. The primary purpose of the agreement was to sell Norton's house. Norton was concerned with selling to a qualified buyer who could provide him with a sizeable cash payment by a a stated date to allow him to invest in other land. The buyer tendered the agreed upon payment of $17,000.00 on May 14, 1981, one day prior to the final closing date of May 15, 1981. It would be unreasonable to void the agreement on the ground of Norton's refusal to accept the agreed upon sum simply because it came from a different

5. We note that this letter is also inconsistent with Norton's affidavit that he had no such knowledge of the August 1980 sale until the beginning of the litigation.

6. Evans testified as follows:

LOENNIG: Is it—was it your understanding, your interpretation of this that if at the time of the sale of the Montana property it did not generate fi—more than say—let's just take a number, say 5, or $6,000.00, then she had until May 15, 1981, to come up with the balance of the funds?

EVANS: I *guess* at the time that the agreement was executed my *assumption* was that the property would be sold, the money would be generated from it, I *guess*, that negotiation

was between Ms.—Mr. Norton and Ms. Herron. I didn't even question what the anticipated proceeds were out of the transaction. It appears to me that if it sold that it would generate the income ...
LOENNIG: Seven ...
EVANS: ... necessary.
LOENNIG: In other words—okay, then this—your interpretation it would say then that you—you felt that—it was your understanding and it was the understanding of the intent of the property that the sale of the Montana property would generate $17,000.00 in cash?
EVANS: *I can't speak for them.*
(Emphasis added).

source. Arguably, Norton was concerned with Herron being able to make the monthly mortgage payments. However, in light of Norton's failure to inquire in any manner as to the equity in Herron's Montana property, possible encumbrances on the land, the probability of a sale or Herron's credit as a whole, we are unconvinced that the parties intended that the disputed paragraph of the contract made the forwarding of the proceeds of the Montana sale a condition precedent to the sale of the house.[7]

In reaching this conclusion we also find persuasive Herron's argument that the disputed provision is not sufficiently unambiguous to be construed as a condition precedent. In *Wirum*, we noted the genuine reluctance of courts to give effect to conditions precedent, and the accepted requirement that such conditions be expressed in plain, unambiguous language or arise by clear implication. *Wirum*, 625 P.2d at 873, *citing United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir.1963), *cert. denied*, 376 U.S. 943, 84 S.Ct. 798, 11 L.Ed.2d 767 (1964); *McAtee v. Wes-Lee Corp.*, 566 P.2d 442, 444 n. 1 (Okl.1977); *Cheever v. Schramm*, 577 P.2d 951, 953 (Utah 1978). As we stated in *Wirum*, "such an interpretation protects both parties to the transaction and also does not involve the consequences that a slight failure to perform wholly destroys all rights under the contract." *Wirum*, 625 P.2d at 873 n. 14. *See generally* 5 W. Jeager, Williston on Contracts § 665, at 133 (3d ed. 1961). As further support, Herron points to well established authority which holds that the existence of the word "only," or a word or words of similar clarity, will determine whether the agreement is one with a condition precedent. *Wirum*, 625 P.2d at 873; *Campisano v. Phillips*, 26 Ariz.App.

174, 547 P.2d 26 (1976); *Watson Construction Co. v. Reppel Steel & Supply Co.*, 123 Ariz. 138, 598 P.2d 116 (Ariz.App.1979); *Mignot v. Parkhill*, 237 Or. 450, 391 P.2d 755 (1964), *appeal after remand*, 247 Or. 465, 430 P.2d 1007 (1967). *See generally Parsons v. Bristol Development Co.*, 62 Cal.2d 861, 44 Cal.Rptr. 767, 402 P.2d 839 (1965); *Sasser & Co. v. Griffin*, 133 Ga. App. 83, 210 S.E.2d 34, 39 (1974).

We find particularly persuasive the decision in *Twin Harbors Lumber Co. v. Carrico*, 92 Idaho 343, 442 P.2d 753 (1968). In that case, the contract in question provided in part: "It is the contemplation of the parties hereto that the said promissory note is to be paid out of the proceeds derived from the sale of the timber now being on the above described real property ...." *Id.* at 756. Ultimately, the debtor was unable to pay the promissory note, as it could not raise sufficient funds from its timber operation. The debtor raised the defense that the proceeds from the operation were to be the exclusive fund for satisfying the debt. The court rejected this contention, holding that the reference to a specific source of payment was an "alternative method of payment." *Id.* at 759. Similarly, the provision in the subject case refers to the probable source of the down payment, or possibly, to the time by which closing must be accomplished; but it does not clearly express an intent that it is the only means by which Norton could be paid. *See Wirum*, 625 P.2d at 873 n. 15.[8]

## III. SPECIFIC PERFORMANCE OF THE AGREEMENT

Norton maintains that Herron had no equitable right to specific performance. Norton asserts that even though Herron

---

7. In light of our holding that the superior court was correct in finding that there was no condition precedent which would have required Herron to forward the proceeds of the Montana sale to the Transamerica escrow, we need not reach the factual issue of whether or not Herron notified Norton of the sale of some of her Montana property, or whether Norton waived his right to enforce a condition precedent by his conduct.

8. *See also Moore v. Continental Casualty Co.*, 366 F.Supp. 954, 955 (W.D.Okl.1973); *Yamanishi v. Bleily and Collishaw, Inc.*, 29 Cal.App.3d 457, 105 Cal.Rptr. 580, 583 (1972); *A.J. Wolfe Co. v. Baltimore Contr., Inc.*, 355 Mass. 361, 244 N.E.2d 717, 720–21 (1969); *Howard-Green Elec. Co. v. Chaney & James Constr. Co.*, 12 N.C.App. 63, 182 S.E.2d 601, 604 (1971); *Mayer v. Basset*, 263 Or. 334, 501 P.2d 782, 789 (1972).

deposited the $17,000.00 into escrow on May 14, 1981, she failed to tender an executed note and deed of trust in a timely manner, failed to provide proof of insurance or payment for fuel, and failed to provide Evans with information regarding property taxes. Norton admits that these deficiencies alone under other circumstances may "not be so substantial as to constitute reason to deny a buyer specific performance," but he asserts that they are substantial in this case. The subject agreement had a time is of the essence clause which made May 15, 1981, the last possible day to close the deal. The position essayed by Norton is that all of these actions constitute a failure by Herron to act reasonably and in good faith. As authority, Norton refers to *Fischer v. Johnson*, 525 P.2d 45 (Utah 1974), where the court stated:

> Specific performance is a remedy of equity; and one who invokes it must have clean hands in having done equity himself. That is, he must take care to discharge his own duties under the contract; and he cannot rely on any mere inconvenience as an excuse for his failure to do so.

*Id.* at 46 (footnote omitted). In *Fischer*, the court held that the plaintiffs, seeking to exercise their option within the deadline, were not entitled to specific performance despite the seller/defendants' attempts to make themselves unavailable during the final hours of the life of the option. In light of our finding that the parties in the present case did not intend the disputed provision to be a condition precedent, it would be inappropriate to find under *Fischer* that Herron was not entitled to specific performance. Rather, we find an Alaska case more helpful to us in deciding whether

Herron was correctly awarded specific performance.

■ In *Hausam v. Wodrich*, 574 P.2d 805 (Alaska 1978), we upheld a judgment of the superior court granting specific performance of a similar contract for the sale of real property.[9] In affirming the award of specific performance, we noted: "An action for specific performance is equitable in nature. The decision to specifically enforce a contract is within the discretion of the trial court and will be reversed on appeal only where it is against the clear weight of the evidence." *Wodrich*, 574 P.2d at 809. *See also Moran v. Holman*, 501 P.2d 769 (Alaska 1972); *Jameson v. Wurtz*, 396 P.2d 68 (Alaska 1964). In the case at hand, we note first that Norton's attorney sent out a letter alleging a breach on May 15, 1981, before Herron was able to actually tender the documents. As we stated in *Wodrich*:

> [C]ourts of equity do not require literal performance of all acts required to be done under the contract before specific performance may be granted. *Although a plaintiff seeking specific performance must demonstrate that he has the ability to perform should specific performance be granted, actual tender is not necessary where the defendant has indicated that he will not complete the transaction.*

574 P.2d at 810 (footnotes omitted) (emphasis added). The record indicates that while Norton refused to accept any of the necessary documents to advance the parties towards conveyance of the property, Herron remained willing to tender the documents necessary to finalize the conveyance.[10] While the record indicates some confusion as to which documents were eventually ten-

**9.** The parties in *Wodrich* entered into a contract for the purchase of an apartment building for the price of $87,000.00; but on the day before the agreed upon closing date, the buyer was $2,000.00 short of the agreed upon down payment of $15,000.00. On the closing day, the buyer refused to complete the transaction over a dispute about whether furniture and a dumpster were included in the purchase price. The buyers brought suit for specific performance and were granted summary judgment. In a trial on

the remaining issues, the finder of fact in *Wodrich* found the plaintiffs in breach of the agreement but found that the breach was not so material as to discharge the parties' agreement. *Wodrich*, 574 P.2d 805, 808 (Alaska 1978).

**10.** We are further persuaded in that Norton himself concedes that failure to supply the supplemental documents "in normal circumstances" would not constitute a material breach."

dered into the escrow, we note that the letter sent by Norton's counsel on May 15, 1981, failed to even mention the failure of the documents as a source of breach. In sum, we find no reason to reverse the finding of the superior court that Herron made a sufficient tender to merit a judgment of specific performance. *See generally Wodrich*, 574 P.2d at 810.

We likewise are unconvinced by Norton's contention that (1) Herron is guilty of bad faith or that (2) her failure to tender the assorted documents together with her alleged bad faith constitutes a material breach, thereby making the judgment of specific performance reversible error. In the recent case of *Dillingham Commercial Co. v. Spears*, 641 P.2d 1 (Alaska 1982), we addressed this issue.

In *Spears*, a tenant brought an action seeking specific performance of a purchase option contained in a lease, and was granted summary judgment. The landlord had terminated the lease (and the incorporated option agreement) for failure by the tenant to make timely payment of property taxes, and had refused to allow the tenant to exercise the option. The lessor, Spears, contended that the summary judgment granting specific performance was improper because the tenant Dillingham had defaulted under the lease, thereby losing the rights of option. This court affirmed the holding of the superior court that Dillingham's defaults were not serious enough to warrant loss of rights under the purchase option. *Id.* at 8 n. 11. *See generally Vozar v. Francis*, 579 P.2d 1056, 1058 (Alaska 1978). While we note that *Spears* involved

a "forfeiture," the application of equitable principles used in *Spears* to prevent a forfeiture are equally appropriate in a case involving a default. *See Spears*, 641 P.2d at 7 n. 7. Accordingly, we look to the substantial amount of money ($17,000.00) applied to the property by the purchaser, as opposed to the failure of Herron to submit the documents. The fact also remains that Herron had paid rent for a year in lease payments, with the lease expiring in May 1981. Under those circumstances, it would be highly inequitable to find that Herron had lost her right to purchase the property. "Equity's goal is to do substantial justice to both parties, and where no injustice would be visited upon the injured party, equity will award him compensation rather than decree a forfeiture against the offending party."[11] *Spears*, 641 P.2d at 6, *quoting Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 575 P.2d 869, 876 (1978). *See also Hendrickson v. Freericks*, 620 P.2d 205, 212 (Alaska 1980).

Finally, Norton urges that the relatively recent opinion of *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), presents arguments against the specific performance of the parties' agreement. At issue in *de la Cuesta* was the pre-emptive effect of a regulation,[12] issued by the Federal Home Loan Bank Board ("the Board"); permitting federal savings and loan associations to use "due-on-sale" clauses in their mortgage contracts.[13] *Id.* at 144, 145, 102 S.Ct. at 3018, 73 L.Ed.2d at 670.

**11.** We note that incident to a decree of specific performance, Norton had an opportunity to obtain compensation for interest lost by the delay. *See* Restatement of Contracts § 365 comment d (1932). As was noted in *Godwin v. Lindbert*, 101 Mich.App. 754, 300 N.W.2d 514, 515 (1980):

A trial court should enforce the equities of the parties in such a manner as to put them as nearly as possible in the position that they would have occupied had the conveyance of the real property occurred when required by the contract.

**12.** *See* 12 C.F.R. 545.8–3(f) (1982). Prior to 1976, the Board had no regulation which specif-

ically referred to due-on-sale clauses. *See* 48 Fed.Reg. 2373 (1983).

**13.** "The due-on-sale clause used in many loan instruments is ¶ 17 of the uniform mortgage instrument developed by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association." *de la Cuesta*, 458 U.S. at 145 n. 2, 102 S.Ct. at 3018 n. 2, 73 L.Ed.2d 664, 670 n. 2. Paragraph 17 appeared in both *de la Cuesta* and the present case. It reads in part:

17. Transfer of the Property; Assumption. If all or any part of the Property or an interest therein is sold or transferred by Borrower

A brief summary of the history of this case is necessary to explain why we decline to find the decision in *de la Cuesta* grounds for reversing this judgment of specific performance. During the 1970's, the Board had become concerned as to the controversy surrounding federal savings and loan investments associations' exercise of due-on-sale contractual provisions. *See generally* 41 Fed.Reg. 6283, 6285 (1976); 48 Fed.Reg. 2373 (1983). *de la Cuesta*, 458 U.S. at 144–145, 102 S.Ct. at 3018–3019, 73 L.Ed.2d at 670–71. The Board concluded that "elimination of the due-on-sale clause will benefit only a limited number of home sellers, but generally will cause economic hardship to the majority of home buyers and potential home buyers." 41 Fed.Reg. 6283, 6285; *de la Cuesta*, 458 U.S. at 146, 102 S.Ct. at 3019, 73 L.Ed.2d at 671. Accordingly, the Board issued a regulation, effective July 31, 1976, governing due-on-sale clauses, expressly affirming the continued right of federal savings and loan associations to exercise due-on-sale provisions, notwithstanding restrictive state laws. *See* 48 Fed.Reg. 2373 (1983); 12 C.F.R. § 545.8–3(f) (1982); *de la Cuesta*, 458 U.S. at 146, 102 S.Ct. ·at 3019, 73 L.Ed.2d at 671.

In *de la Cuesta*, the three appellees had purchased California real property from borrowers, who in exchange for the loan,

had given Fidelity Federal Savings and Loan Association ("Fidelity") [14] deeds of trust on each of the appellee's property. Each deed contained a due-on-sale clause; two of the deeds also included a provision (¶ 15) which provided in part that the deed "shall be governed by the law of the jurisdiction in which the Property is located." *de la Cuesta*, 458 U.S. at 148, 102 S.Ct. at 3019, 73 L.Ed.2d at 672.

Fidelity was not notified prior to each of the purchases, and gave notice of its intent to enforce the due-on-sale clause. Ultimately, the parties were unable to settle, and the appellees filed suit to block the nonjudicial foreclosure process.[15] The United States Supreme Court reversed the California Court of Appeal for the Fourth Appellate District, and held that the Board's due-on-sale regulation was meant to pre-empt conflicting state limitations on the due-on-sale practices of federal savings and loan associations. *de la Cuesta*, 458 U.S. at 159, 102 S.Ct. at 3025, 73 L.Ed.2d at 679. Norton admits that *de la Cuesta* does not discuss the issue of wrap-around trusts and alternative financing arrangements in general, yet he urges us to reverse the award of specific performance by stating, "it is *now likely* that ... the underlying lender will enforce the 'due-on-sale' clause with federal authority for doing so." [16]

---

without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, *Lender may, at Lender's option, declare all the sums secured by this Deed of Trust to be immediately due and payable.* *Id.* (emphasis in original). This permits the lender to declare the entire balance of a loan immediately due and payable if the property securing the loan is sold or otherwise transferred.

**14.** Appellant Fidelity is a private mutual savings and loan association chartered by the Board pursuant to § 5(a) of the Home Owners' Loan Act of 1933 ("HOLA"), 48 Stat. 128, as amended, 12 U.S.C. § 1464(a) (1976 ed., Supp. IV).

**15.** The appellees, residents of California, asserted that under the principles announced by the California Supreme Court in *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978), Fidelity's exercise of the due-on-sale clause violated California's prohibition of unreasonable retraints, Cal.Civ.Code Ann. § 711 (West) (1954), "unless the lender can demonstrate that enforcement is reasonably necessary to protect against impairment to its security or the risk of default." *de la Cuesta*, 458 U.S. at 149, 102 S.Ct. at 3020, 73 L.Ed.2d at 672, *quoting Wellenkamp v. Bank of America*, 148 Cal.Rptr. at 386, 582 P.2d at 977 (citation omitted). The Court of Appeal for the Fourth Appellate District concluded *inter alia* that *Wellenkamp* was controlling and that Congress had not expressed an intent to pre-empt due-on-sale law. *de la Cuesta*, 458 U.S. at 150, 102 S.Ct. at 3020, 73 L.Ed.2d at 673.

**16.** Norton's deed of trust is held by Pacific National Bank of Washington, a federally chatered bank. Norton admits that the lender has not

(Emphasis added) Norton argues that it would be inequitable for him to be "locked into" an agreement where he will collect only 9¼ from Herron, since he did not contemplate the *possibility* of federal intervention in their contract resulting in a higher interest rate.

As in *de la Cuesta*, Norton's underlying mortgage contains both ¶ 17, the due-on-sale clause, and ¶ 15 which provides that the deed shall be governed by the law of the jurisdiction in which the property is located. However, it is pure conjecture for Norton to suggest that his lenders will enforce the due-on-sale clause with "federal authority for doing so." While there has been a proposal by the Board to revise its regulations pertaining to pre-emption of state laws restricting the use of due-on-sale clauses with regard to non-federally chartered lenders, *see* 48 Fed.Reg. 2373 (1983), that proposal has not been adopted. As we noted in *Lien v. City of Ketchikan*, 383 P.2d 721 (Alaska 1963): "At this time plaintiff is unable to show that he has sustained or is immediately in danger of sustaining some direct injury .... What plaintiff asks us to do is to give an abstract opinion on what is in essence a hypothetical case, and that we shall not do." *Id.* at 724–725. *See Poe v. Ullman*, 367 U.S. 497, 504, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989, 997 (1961).[17] Accordingly, we uphold the order of specific performance.

AFFIRMED.

---

yet enforced the due-on-sale clause. Thus, Norton's argument that specific performance would somehow frustrate the purpose of his entering into the contract fails for there has been no intervening event between the execution of the option and Herron's efforts to compel performance. *See generally* A. Corbin, Corbin on Contracts § 1353–1355, 1 Volume Edition (1980). *See also United States v. General Douglas Mac-*

*Arthur Senior Village, Inc.,* 508 F.2d 377, 381 (2d Cir.1974).

**17.** Under *de la Cuesta*, this court would also have to decide whether a regulation promulgated by the Comptroller General would have a retroactive effect on Norton's 1977 deed of trust. *de la Cuesta*, 458 U.S. at 170–171 n. 24, 102 S.Ct. at 3031 n. 24, 73 L.Ed.2d at 686 n. 24.