*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KELLEY PATTON HERRING, n/k/a Kelley Patton, | ) ) ) | Supreme Court No. S-15886 |
| Appellant, | ) ) | Superior Court No. 3AN-13-05718 CI |
| v. | ) ) | O P I N I O N |
| GARY DWAYNE HERRING, | ) ) ) | No. 7105 – May 13, 2016 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Douglas C. Perkins, Hartig Rhodes LLC, Anchorage, for Appellant. Rhonda F. Butterfield, Wyatt & Butterfield, LLC, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

FABE, Justice.

## I.      INTRODUCTION

A divorcing couple reached a settlement agreement that was incorporated into a divorce decree issued by the superior court. The settlement provided that the qualified marital portion of the husband's pension would be distributed to the wife and the nonqualified portion would be distributed to the husband, subject to a provision for equitable reallocation if the values of those portions changed significantly. The

settlement also described four firearms and ammunition that the husband would deliver to the wife. After the decree issued, the wife's portion of the pension declined in value and the husband's portion increased, so the wife filed motions attempting to obtain information about the reasons for this change in value and attempting to enforce the settlement agreement's equitable reallocation provision to compensate for the changes. She also argued that the husband had not delivered the specific guns bargained for at settlement. After motion practice and an evidentiary hearing, the superior court ruled for the husband in all respects, and it awarded enhanced attorney's fees against the wife. The wife appeals.

We conclude that the significant change in the relative values of the parties' pension accounts triggers the verification and reallocation provision of their settlement agreement. Accordingly, we reverse the superior court's denial of the wife's motion for an equitable reallocation and remand for an equitable reallocation according to the parties' agreement. Because the husband is no longer the prevailing party, we also vacate the superior court's award of attorney's fees to the husband. We affirm the superior court's decision as to the parties' firearms.

## II.    FACTS AND PROCEEDINGS

### A.    Divorce Settlement

Kelley Patton and Gary Herring were married in Texas in 1981. Patton filed for divorce on March 11, 2013, and the parties legally separated on March 31, 2013. Patton and Herring were both residents of Alaska at the time.

The parties participated in a mediation to negotiate the terms of their divorce. Leading up to this mediation, Patton had attempted to obtain financial information from Herring, and Herring appeared reluctant to provide full information. The superior court judge had informed Herring that he was required under Alaska Civil Rule 26.1 to provide signed releases allowing Patton to access his financial account

information. When Herring failed to provide the required releases, Patton filed a motion to compel, and the superior court granted the motion on November 1, 2013, the day after the mediation.

Despite the lack of complete financial information, the parties proceeded with the mediation on October 31, 2013. Both parties were represented by counsel at the mediation. The parties reached a settlement and signed a document listing the agreed-upon distribution of their assets. Three of those assets are disputed in this appeal: Herring's Retirement Accumulation Plan from BP (BP pension), a Fidelity Roth IRA account, and several firearms. The parties' agreement was later typed and presented in a spreadsheet. The agreement specified that 100% of the "qualified portion" of the BP pension would go to Patton, while the "nonqualified portion" would remain with Herring. But the agreement contained the caveat that the parties needed to verify that the BP pension could be divided by a Qualified Domestic Relations Order (QDRO) and that they "must see numbers the percentages are based on[:] current values." The agreement next provided that 45% of the Fidelity Roth IRA account would be distributed to Patton and 55% would be distributed to Herring, but it explained that this transfer was subject to an equalization mechanism that the parties had created to deal with the uncertainty of the BP pension's value. Finally, the agreement provided that Patton would receive "four guns previously discussed plus ammo."

After some discussions regarding the appropriate terms for dividing the BP pension account, the parties used the Fidelity website to generate a QDRO reflecting their agreement that 100% of the qualified marital portion of the BP pension would go to Patton, while 100% of the nonqualified and nonmarital portions would remain with Herring. Based on the parties' elections in filling out the QDRO form online, the QDRO also specified that Patton was "not entitled to any early retirement subsidy." At this point

the parties did not know the exact amount that each would be awarded from the BP pension account because the QDRO had not yet been executed.

The parties then submitted to the court their draft findings of fact and conclusions of law, representing their settlement agreement, along with the typed version of the original agreement. The superior court held a settlement hearing on December 10, 2013. Patton was represented by counsel at this hearing, but Herring represented himself. At the hearing, the superior court discussed certain elements of the settlement with the parties to make sure they agreed on the terms.

As the court described the settlement agreement, it provided that the parties would distribute the BP pension according to the terms set out in the property division, but that the exact amount of the qualified and nonqualified portions would not be known until a QDRO had been executed for the account. The parties therefore agreed to hold part of their Roth IRA account in "escrow" and use that amount to make any necessary adjustments after the exact values of the qualified and nonqualifed portions of the BP plan were established. The court explained that, "based on the extent to which their expectations were met or were unmet from the time of the mediation," the parties would "use the Roth IRA retained portion . . . to essentially compensate one or both parties to some extent for what they didn't get by way of the QDRO that they expected to get." Near the conclusion of the hearing, the superior court verified that both parties "underst[ood] that . . . except for the specific areas that [they were] leaving open as subject to further negotiation, which relate to the BP QDRO and the subsequent allocation of the Roth IRA, . . . everything [was] finalized and . . . concluded." Both parties testified that they understood and that they agreed with the terms as the court described them.

On the day of the hearing, the superior court signed the QDRO presented by the parties and issued a divorce decree. Patton then moved for entry of her proposed

findings and conclusions, which reflected the parties' agreement by providing that Patton would receive "100% of the qualified marital portion of the . . . BP pension . . . , which has an approximate present value of $1,388,856, subject to verification that the qualified marital portion of the pension can be transferred in whole to Plaintiff [Patton], including dividends, interest, gains and losses thereon." They provided that Herring, in turn, would retain "100% of the marital and non-marital portions of the nonqualified amount of the . . . BP pension[], which has an approximate present value of $125,835, including dividends, interest, gains and losses thereon." The proposed findings and conclusions then spelled out the mechanism for escrow and equitable reallocation in the event that these BP pension amounts differed significantly from the amounts estimated at the time of settlement. It provided that Patton would receive:

> 45% of the Fidelity GDH Roth IRA account . . . , which has a total approximate value of $350,234 . . . , except that:
>
> i.    $140,000 will be held in escrow and not distributed from said Roth IRA account pending verification of the amounts distributed according to paragraphs 8j [regarding Patton's portion of the BP pension] and 91 [regarding Herring's portion of the BP pension] below;
>
> ii.    In the event that the amounts of said distributions materially differ from the approximate values set forth in paragraphs 8j and 91 below, the parties may either agree on a reallocation of the Fidelity GDH Roth IRA to adjust for any such material difference, or if they cannot agree, they may submit this issue to the Court for it to determine an equitable reallocation . . . .

The proposed findings and conclusions contained an essentially identical provision allocating the remaining 55% of the Roth IRA account to Herring and explaining this same "escrow" mechanism.

Finally, the proposed findings and conclusions provided that, "[u]nless otherwise agreed by both parties," Patton would receive "four guns now in the possession of [Herring], including . . . a shotgun [and] an Uzi with folding stock in a black factory case," as well as "500 rounds of 9 mm ammo, one case of shells for the shotgun, [and] four magazines for the Uzi." The proposed findings and conclusions gave the parties 30 days to "work cooperatively and promptly to execute all documents and make all other arrangements necessary to transfer property awarded herein to the other party."

Herring objected to certain terms in Patton's proposed findings and conclusions. At this point the parties still did not have final information about the value of the BP pension's qualified and nonqualified portions, and both parties appeared to believe that the value of Herring's portion had fallen. But the court concluded that any such shortfall could be addressed through the equitable adjustment mechanism that had been designed by the parties as reflected in the findings and conclusions. The court explained that "[t]he language in the proposed [findings and conclusions] accurately tracks the agreement . . . made during the December 10 settlement conference, which address[es] uncertainty concerning the amounts the parties will receive when [the] defendant's [pension] is QDRO'd." The superior court further explained that the "[p]laintiff's description of how the parties agreed to address the issue, including the mechanism of holding back $140,000 in 'escrow,' is accurate." Accordingly, the court entered these findings and conclusions in January 2014. Neither party challenges the validity or accuracy of the findings and conclusions, though they debate the interpretation of some of their terms.

B.    **Subsequent Proceedings**

The proceedings following the divorce settlement focused on the verification of, and eventually the dispute over, the values of the two portions of the

BP pension account. Despite the provision of the findings and conclusions allowing for "verification of the amounts distributed" from the BP pension account, it appears that Herring prevented Patton from immediately receiving the information she needed in order to verify the amounts that would be distributed under the QDRO for that account. In March 2014 Patton requested another signed release from Herring so that she could obtain the necessary information from Fidelity, which managed the pension account. When Herring did not provide the requested release, Patton filed a notice of records deposition in early April, indicating that she intended to subpoena Fidelity and take a records deposition directly from Fidelity. Now represented by counsel, Herring filed a motion to quash the subpoena, which the superior court granted.

Still unable to access information on the amount of the BP pension distributions, in May 2014 Patton filed a motion to reopen discovery "for the limited purpose of identifying and quantifying and equitably awarding any additional or undistributed marital assets." By the time she filed her reply brief, the QDRO had been processed and the parties' respective pension amounts had been divided between them; thus Patton learned for the first time that her award had decreased substantially. Patton explained to the court that the value of her portion of the BP pension had "decreased by $374,000, i.e. a 27% loss in value." She therefore asked the court to make an equitable reallocation under the relevant allocation mechanism in the divorce settlement, emphasizing that "the 'escrowed' Roth IRA funds still remain[ed] undistributed" because final verification of the BP pension amounts had not yet occurred. (Emphasis omitted.) In response, Herring continued to oppose Patton's verification efforts, including by filing a motion for an "order that [Patton] stop accessing . . . Herring's accounts."

In June 2014 the superior court granted Herring's motion and ordered Patton not to access his accounts "unless specifically authorized by [the] court," but it also granted in part Patton's motion to reopen limited discovery on the amount of the

disputed BP pension. Because of the "escrow" and reallocation mechanism designed to account for any difference in the amount of the BP pension distributions, the superior court concluded that the findings and conclusions "clearly impl[y] that . . . Patton is entitled to learn the amount of the non-qualified BP [pension account] that . . . Herring received or would receive." The superior court added that "the total amount available in the BP [account] must be known so that the parties and court can determine an equitable allocation." The superior court then stayed Patton's request to equitably reallocate assets pending further briefing and discovery.

By August 2014 Patton had not received the information she sought regarding Fidelity's method of calculating the parties' shares of the BP pension. She had nonetheless learned that Herring's portion of the BP pension, rather than decreasing as the parties initially believed, had actually increased to roughly $609,000. Given this significant increase over the $125,000 to $133,000 estimated at mediation — in contrast to the $374,000 decrease in her own portion — Patton continued her attempt to obtain information on how Fidelity had calculated the parties' shares. Herring, in turn, alleged that the reduction in Patton's share had resulted from the actuarial adjustment factors provided in the QDRO, coupled with Patton's own decision to begin receiving benefits before Herring retired, which reduced the amount of her share. The superior court granted Patton's motion to compel discovery on this point, ordering Herring to sign a release authorizing Fidelity to provide information regarding the calculation of benefits, not just the final value of the distributions.

Once she had completed the authorized discovery and obtained the information she sought, Patton filed a motion to amend the QDRO in January 2015. She alleged that she had been "erroneously deprived" of the early retirement subsidy, and she requested that the court issue an amended QDRO with a "simple correction" awarding this subsidy to her. Herring opposed the motion for an amended QDRO, explaining that

Patton's legal and financial advisors had prepared the original QDRO, which explicitly stated that Patton was "not entitled to any early retirement subsidy."

Patton had also alleged that Herring had failed to comply with the court's property division order regarding the parties' firearms, claiming that she had not received the shotgun or the Uzi that had been agreed upon at mediation. Accordingly, she requested that the court order Herring to show cause why he should not be held in contempt. Herring countered that he had twice delivered an Uzi in compliance with the superior court's findings and conclusions but that Patton had refused it both times, claiming it was not the one she had bargained for in the divorce settlement. Herring maintained that "[n]o specific Uzi was bargained for." The superior court granted Patton's motion that Herring appear before the court and show cause why he should not be held in contempt for failing to deliver the specified firearms.

The superior court held an evidentiary hearing on Patton's motion for an amended QDRO, her request for equitable distribution of the "escrowed" Roth IRA funds (which had been stayed since the court's June 2014 order), and Herring's alleged failure to deliver the guns specified in the property division. The hearing took place over three days in February 2015. The superior court heard testimony from Patton's financial expert and from representatives of Fidelity and BP. The court admitted into evidence a February 2015 letter from Fidelity to Patton's attorney, which explained how the amounts of the BP pension benefits had been calculated. The letter explained that Fidelity had applied its standard actuarial equivalence factors, which reduced the amount of Patton's benefit *and* increased Herring's benefit because (1) Patton had not received the early retirement subsidy and (2) she had begun receiving benefits before Herring. Accordingly, it explained that Patton's distribution had been reduced by $464,346.04. Importantly, the letter also clarified that "[t]he difference of $464,346.04 would be retained by . . . Herring."

At the end of the evidentiary hearing the superior court issued a ruling from the bench, denying Patton's motion for an amended QDRO and declining to make an equitable reallocation based on Patton's reduced benefits. The court later issued written findings of fact and conclusions of law elaborating on its bench ruling. Focusing only on the reduction in Patton's benefits, and not the increase in Herring's, the superior court first concluded that "it wasn't . . . Herring's fault" that Patton's benefit had been reduced. Instead, the court relied on the letter from Fidelity to conclude that the reduction had been the result of Fidelity's application of its standard actuarial factors, the effect of Patton not receiving the early retirement subsidy in the QDRO, and Patton's decision to take her benefits before Herring retired. The superior court also concluded that the parties' decision not to award the early retirement subsidy to Patton had been a bargained-for part of their divorce settlement, and thus that Patton "received what she bargained for."

Accordingly, the superior court concluded that there was no "basis for setting aside the settlement" by issuing an amended QDRO. It explained that a divorce settlement agreement cannot be modified unless there is a mutual mistake by both parties[1] or a unilateral mistake coupled with "fraudulent or inequitable conduct" by the other party,[2] and it concluded that those circumstances did not exist here.

The superior court also concluded that there was no basis for making an equitable reallocation because the verification period and adjustment mechanism contained in the divorce settlement "either d[id] not apply or ha[d] expired." The superior court found that it was "past the time for equitable adjustment to take place,"

___

[1] *See Cook v. Cook*, 249 P.3d 1070, 1080-81 (Alaska 2011).

[2] *Voss v. Brooks*, 907 P.2d 465, 468 (Alaska 1995) (quoting 6A RICHARD R. POWELL, POWELL ON REAL PROPERTY ¶ 901[1][d], 81A-162-163).

concluding that because "over a year elapsed prior to . . . Patton's motion to amend the QDRO," any equitable adjustment was barred. The superior court also concluded that the decrease in the value of Patton's account (and presumably the corresponding increase in Herring's) fell outside the equitable allocation provision of the settlement agreement. Because it concluded that no equitable adjustment was warranted, the superior court ordered the Roth IRA account to be distributed in accordance with the original divorce settlement (45% to Patton and 55% to Herring). It ordered that the $140,000 held in "escrow" pending verification of the BP pension amounts also be released in the same ratio.

Finally, the court briefly explained that it found Herring's testimony on the firearms issue to be "more persuasive" than Patton's testimony. The superior court therefore concluded that "the weapons previously offered to [Patton] by . . . Herring" were sufficient to satisfy the terms of the settlement, and it gave the parties 30 days to arrange for transfer of the firearms.

Herring then moved for an award of full attorney's fees, totaling nearly $30,000 plus over $500 in costs, alleging that "Patton engaged in both vexatious and bad faith conduct in initiating and continuing to pursue this post-divorce litigation over and over." Patton opposed the motion for full fees, arguing that she had brought her claims in good faith and that Herring's own obstructive conduct had contributed to the lengthy litigation. The superior court awarded Herring 80% of his fees (totaling approximately $22,000) and his full costs. It described Patton's litigation approach as "aggressive" and found that there had been "no evidence supporting [Patton's] allegations that . . . Herring, or Fidelity, or both, had anything to do with her reduced benefits." Based on this ultimate result, the superior court concluded that "Patton engaged in this litigation in bad faith" and that she had "failed to make reasonable inquiry or exercise due diligence in

obtaining facts before she began litigation."  The court therefore concluded that an enhanced fee award was justified.[3]

Patton appeals the superior court's denial of her motion for an amended QDRO, its denial of an equitable allocation from the Roth IRA account, its distribution of the parties' firearms, and its award of enhanced attorney's fees to Herring.

## III.   STANDARD OF REVIEW

We generally "review questions regarding a trial court's response to a motion to enforce a [divorce] settlement under the abuse of discretion standard."[4]  But "[i]n making this inquiry, the standard of review is necessarily intertwined with the substantive law governing settlement agreements."[5]  When the parties have reached a settlement as to property division, "[w]e apply basic contract interpretation principles to interpret a property division agreement incorporated into a divorce decree."[6]  In turn, "[w]e treat the interpretation of contract language as a question of law and interpret the language de novo."[7]  To the extent that other relevant questions in a divorce case

---

[3]     *See* Alaska R. Civ. P. 82(b)(3)(G) (allowing courts to increase an award of attorney's fees for "vexatious or bad faith conduct").

[4]     *Ford v. Ford*, 68 P.3d 1258, 1263 (Alaska 2003) (citing *Dickerson v. Williams*, 956 P.2d 458, 462 (Alaska 1998)).

[5]     *Colton v. Colton*, 244 P.3d 1121, 1126 (Alaska 2010) (citing *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996)).

[6]     *Cook*, 249 P.3d at 1077 (citing *Burns v. Burns*, 157 P.3d 1037, 1039 (Alaska 2007)); *see also Mahan v. Mahan*, 347 P.3d 91, 94 (Alaska 2015) (citing *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[7]     *Cook*, 249 P.3d at 1077 (citing *Norton v. Herron*, 677 P.2d 877, 880 (Alaska 1984)).

implicate the superior court's equitable power, "[w]e apply an abuse of discretion standard to the superior court's use of its equitable power."[8]

We review an award of attorney's fees under Alaska Civil Rule 82, including an award of enhanced attorney's fees, for abuse of discretion.[9] Therefore a fee award "will not be disturbed on appeal unless it is 'arbitrary, capricious, or manifestly unreasonable.' "[10] But because an enhanced fee award under Rule 82(b)(3)(G) "calls into question [a party's] litigation conduct and the potential merits of [the party's] underlying . . . motions, we assess de novo the legal and factual viability of his [or her] motions and review relevant findings of fact for clear error."[11]

## IV. DISCUSSION

### A. Declining To Make An Equitable Reallocation, As Mandated By The Divorce Settlement, Was Error.

Patton argues that the superior court erred by denying her motion for an equitable reallocation to compensate for the fact that she received 27% less, and Herring received correspondingly more, than the amounts bargained for at settlement. She maintains that the parties' agreement contained specific estimated values with a mechanism for equitable adjustment if they did not receive the amounts anticipated in the settlement agreement. And she explains that her request for equitable reallocation

---

[8]     *Beal v. Beal*, 209 P.3d 1012, 1016 (Alaska 2009) (citing *Carroll v. Carroll*, 903 P.2d 579, 582 n.7 (Alaska 1995)).

[9]     *Johnson v. Johnson*, 239 P.3d 393, 399 (Alaska 2010) (citing *Hopper v. Hopper*, 171 P.3d 124, 133 (Alaska 2007)).

[10]     *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Ferguson v. Ferguson*, 195 P.3d 127, 130 (Alaska 2008)).

[11]     *Johnson*, 239 P.3d at 399 (citing *State, Dep't of Revenue, Child Support Enf't Div. v. Allsop*, 902 P.2d 790, 795-96 (Alaska 1995)).

is not a post-divorce modification motion; rather, it is the finalization of the parties' property distribution settlement. We agree. The parties' settlement agreement contained an express provision creating an equitable reallocation mechanism using the Roth IRA funds to deal with the uncertainty surrounding the value of the BP pension distributions. Because that mechanism was triggered by the decrease in Patton's portion and the corresponding increase in Herring's portion of the BP pension, an equitable reallocation is the appropriate bargained-for remedy.

Herring argues that the equitable reallocation mechanism in the settlement agreement was not triggered because that provision was designed for only two purposes: first, to protect each party against unauthorized withdrawals by the other, and second, to protect only Herring against a decrease in the value of his portion due to external factors. He also contends that the parties agreed on distributions based on percentages, not dollar values. Although the superior court agreed with these arguments, we conclude that they conflict with the terms of the parties' settlement agreement as reflected in the original findings and conclusions entered by the superior court.

In our independent review of the terms of the settlement agreement,[12] we apply general principles of contract interpretation.[13] First, as we recently explained in *Baker v. Ryan Air, Inc.*, we give effect to every part of a contract.[14] Here, the settlement reached by the parties expressly stated the anticipated approximate values of Patton's and Herring's portions of the BP pension. And the parties' original signed agreement included a handwritten note stating that the parties "must see [the] numbers the percentages [were] based on." Moreover, the parties' equitable reallocation mechanism

---

[12]    *See Cook*, 249 P.3d at 1077 (citing *Norton*, 677 P.2d at 880).

[13]    *Id.* (citing *Burns v. Burns*, 157 P.3d 1037, 1039 (Alaska 2007)).

[14]    345 P.3d 101, 112 & n.32 (Alaska 2015).

contained an express provision holding funds in "escrow" pending verification of those BP pension amounts. To give effect to the anticipated dollar values and the verification provision of the parties' agreement, we conclude that the actual and relative values of the BP pension distributions to both parties are an integral element of the settlement agreement.

Herring next contends that the reallocation mechanism does not protect Patton against a reduction in the value of *her* portion of the BP account. But this interpretation, too, is at odds with the relevant provision of the settlement agreement. Herring's contention is based on a more general provision of the agreement, which requires the parties to verify that there have been "no significant transfers or withdrawals" from any of their financial accounts, but which also states that this verification was completed by the time the superior court's findings and conclusions were entered. The reallocation provision relating specifically to the BP pension and the Roth IRA account, by contrast, expressly indicates that verification of the BP distributions is still "pending" and provides for equitable reallocation in the event that the amounts received "materially differ" from the amounts contemplated at the time of settlement — regardless of the reason for that difference.

The superior court appeared to believe that the broader provision relating to possible "transfers or withdrawals" applied to the BP pension, and thus it concluded that the reallocation mechanism was not triggered because Herring had not made any transfers or withdrawals from the BP account. But this provision applies to the parties' other financial accounts rather than the funds at issue here, and it conflicts with the specific provision relating to the BP pension. Under the contract interpretation principle

that a specific provision takes precedence over a more general provision,[15] we conclude that only the BP-specific provision applies to the funds disputed here. And the BP-specific provision contains no limiting language to suggest that it was designed to protect only Herring and not Patton: It simply mandates equitable reallocation if *either party's* amount received "materially differs" from the amount anticipated by the parties. So we conclude that the Roth IRA reallocation mechanism was designed to protect both parties against a change in value of their anticipated shares of the BP account, whatever the source of that change.

This interpretation conforms with the parties' intent at the time of settlement.[16] "In determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made."[17] Here, the superior court's discussion with the parties at the settlement hearing shows the parties contemplated that the reallocation mechanism could apply to both parties. The court explained that the adjustment provision could be used "to . . . compensate one *or both* parties to some extent for what they didn't get by way of the QDRO." (Emphasis added.) And when the court recited the agreement at the end of the

---

[15] *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) ("In contracts, as in statutes, 'where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, . . . if there is a conflict, the specific section will control over the general.' " (quoting *Estate of Hutchinson*, 577 P.2d 1074, 1075 (Alaska 1978))).

[16] *See Bernard v. Alaska Airlines, Inc.*, 367 P.3d 1156, 1159 (Alaska 2016) ("When interpreting contracts, the goal is to 'give effect to the reasonable expectations of the parties.' " (quoting *Larsen v. Municipality of Anchorage*, 993 P.2d 428, 431 (Alaska 1999))).

[17] *Id.* (quoting *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996)).

settlement hearing and asked for each party's acknowledgment that they understood and agreed with it, the court explained that the parties were "going to have to wait and see what happens with the BP QDRO and make an adjustment, where both parties may have to share in whatever loss occurs, but there [would] be some adjustment that occurs with the Roth IRA."  The parties testified that they understood and agreed with this characterization of their settlement.  Based on these statements during the settlement hearing, we cannot conclude that the parties intended to limit the equitable adjustment mechanism to protect only Herring or to address only withdrawals or transfers made by the parties.

Indeed, now that one portion of the BP account has decreased and the other has increased by a corresponding amount, this appears to be exactly the type of situation that the Roth IRA reallocation mechanism was designed to address.  The superior court concluded that Patton was not entitled to an equitable adjustment because the change in value was a result of her own decision to begin receiving benefits early:  In the court's words, "Patton effectively made a choice between 'more money later' versus 'less money now,' and chose the latter."  But the QDRO did not explain, and the parties did not appear to understand, that Patton's election to begin receiving immediate distributions would also cause Herring's benefits to increase, resulting in an allocation of benefits significantly different from the amounts contemplated at settlement.  The parties expected that they would each receive a specified amount, and these amounts were a bargained-for part of their ultimate settlement.  Instead Herring received both an amount that turned out to be higher than the $125,000-$133,000 estimated at settlement *and* the $464,346 that he received (and Patton lost) as a result of Patton's early benefit election, for a total of $609,000 of pension benefit to Herring.  This unanticipated shift substantially changed the percentages of the originally estimated total retirement account that each party was to receive.

Now that Herring has received substantially more and Patton has received substantially less than the amounts that they bargained for, this disparity triggers the equitable reallocation provision relating to the BP pension and the Roth IRA "escrowed" funds. It was therefore error to conclude that the reallocation mechanism was not triggered. And once that provision has been triggered, the appropriate remedy is the contractual remedy specified by the parties.[18] Here, that means the court must make an equitable reallocation of the "escrowed" Roth IRA funds to account for the disparity in the BP pension distributions. We therefore reverse the superior court's denial of the motion for equitable reallocation, and we remand for an equitable distribution of the "escrowed" Roth IRA funds in accordance with the parties' settlement agreement.

On remand, the fact that Patton's elections played a role in her decreased benefits could be relevant to the amount she receives in an equitable distribution. But it does not bar relief completely under the terms of the parties' settlement, particularly in light of the windfall that Herring received. While Patton may bear some of the burden of her own decision to take immediate benefits and any resulting decrease in value, the increased value of Herring's distribution and the parties' original anticipated percentages of the BP pension must also be considered in determining the appropriate amount of the equitable reallocation.

The superior court also concluded that Patton's request for an equitable reallocation was time-barred because "over a year elapsed prior to [her] motion to amend the QDRO." But Patton had originally requested an equitable reallocation in May 2014, only a few months after entry of the original findings and conclusions confirming the

---

[18]    *See, e.g.*, *Pierce v. Catalina Yachts, Inc.*, 2 P.3d 618, 622 & n.18 (Alaska 2000) (allowing parties to prescribe contractual remedies); *Kelly v. Miller*, 575 P.2d 1221, 1224 (Alaska 1978) (holding that the plaintiff "was limited to contractual remedies").

parties' settlement agreement. Moreover, she had spent the intervening time attempting to obtain full information about the amounts of the parties' BP distributions, so any delay was due to Herring's unwillingness to provide this information and not to any delay on Patton's part. Finally, the superior court stayed Patton's request for an equitable reallocation pending further briefing and discovery. The parties undertook this discovery and briefing over the following months, and the superior court ultimately addressed Patton's motion for an equitable reallocation in March 2015 (at the same time as it ruled on her motion for an amended QDRO). Given that Patton's motion had been stayed until that point, it was an abuse of discretion to conclude that the reallocation was then barred by the intervening passage of time.

## B. The Superior Court Did Not Abuse Its Discretion In Denying Patton's Motion For An Amended QDRO.

Patton's motion for an amended QDRO is properly viewed as a request for a different remedy addressing the same disparity in the BP pension distributions. The superior court was correct to conclude that the QDRO cannot be amended. Evidence in the record from BP representatives indicates that Patton is not permitted to "unwind" her pension elections after initially executing a QDRO that did not award her the early retirement subsidy. Moreover, as explained above, the parties created a specific contractual remedy to account for any changes in the BP pension's value. Where a contractual remedy has been specified and bargained for by the parties, the correct approach is to apply that remedy.[19] So the proper remedy here is not an amended QDRO; it is the application of the contractual provision for equitable reallocation.

Similarly, there is no need to analyze this case under the mistake doctrine, which sometimes permits reformation of contract or settlement terms. Instead, the proper

---

[19] *See Pierce*, 2 P.3d at 622 & n.18.

approach is to give the parties the benefit of their bargain, which includes the contractual remedy of the equitable reallocation mechanism. We therefore conclude that the superior court did not abuse its discretion by denying Patton's motion to amend the parties' QDRO for the BP pension.

### C. The Superior Court Did Not Abuse Its Discretion In Distributing The Parties' Firearms According To The Divorce Settlement.

Despite Herring's attempts to deliver the firearms allocated to Patton in the divorce settlement, Patton contends that Herring has not yet delivered the particular Uzi she bargained for, which she refers to as the "marital Uzi." But Patton has presented no evidence, other than her own arguments, to show that the gun Herring delivered to her was not a part of the marital estate. Nor has Patton shown that the Uzi delivered to her failed to meet the terms of the parties' agreement as expressed in the superior court's findings and conclusions, which specified only that she was entitled to "an Uzi with folding stock in a black factory case." Patton has not disputed that Herring offered her a gun technically conforming to this definition, but she argues that she is entitled to a different Uzi and that "she will recognize it once she receives it."

Herring has countered Patton's contentions by offering a detailed description of the guns owned by the parties while they were married, in which he explained that the Uzi he offered her was indeed one of the guns in the marital estate at the time of separation. To counter Patton's contentions that she is entitled to a specific Uzi chambered for 45 ACP ammunition, Herring points to the fact that the divorce settlement awarded Patton "500 rounds of 9 mm ammo" for her Uzi, and that the Uzi he attempted to give Patton is indeed chambered for 9 mm ammunition.

Faced with this evidence, the superior court concluded that "Herring's account of the settlement with respect to the Uzi is superior in detail, technical understanding, and internal-logic to that of . . . Patton." The court therefore found

Herring's testimony "more persuasive" than Patton's. Because "[w]e defer to a superior court's credibility determinations,"[20] we do not overturn the superior court's conclusion regarding the parties' testimony on this point. We thus conclude that the superior court did not abuse its discretion in denying Patton's contempt motion and ordering the parties to carry out the terms of the divorce settlement by "arrang[ing] for the transfer of the weapons previously offered to [Patton] by . . . Herring," which meet the description of the firearms provided in the settlement agreement.

### D. The Award Of Attorney's Fees Is Vacated.

The superior court awarded Herring 80% of his attorney's fees and his full costs. Alaska Civil Rule 82 generally permits an award of partial attorney's fees to the prevailing party in a civil dispute,[21] but enhanced fees may only be awarded upon consideration of certain enumerated factors, including a party's "vexatious or bad faith conduct."[22] Because we reverse and remand the superior court's denial of Patton's motion for equitable reallocation, Herring is no longer the prevailing party and the award of attorney's fees in his favor must be vacated.[23]

---

[20] *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012).

[21] Alaska R. Civ. P. 82(a). Although divorce judgments are generally not subject to attorney's fees under Rule 82, we have consistently held that "[t]he divorce judgment exception to Rule 82 does not apply to post-judgment modification and enforcement motions" like the proceedings on appeal here. *See McGee v. McGee*, 974 P.2d 983, 992 (Alaska 1999) (alteration in original) (quoting *Lowe v. Lowe*, 817 P.2d 453, 460 (Alaska 1991)).

[22] Alaska R. Civ. P. 82(b)(3)(G).

[23] *See, e.g.*, *Cragle v. Gray*, 206 P.3d 446, 452 (Alaska 2009) ("We . . . vacate the attorney's fees award because [the appellee] is no longer the prevailing party."). We take this opportunity to note that enhanced attorney's fees are not justified where, as

(continued...)

## V.    CONCLUSION

We AFFIRM the superior court's denial of Patton's motion for an amended Qualified Domestic Relations Order, but we REVERSE its denial of her motion for an equitable reallocation and REMAND for a determination of the appropriate equitable reallocation amount. Accordingly, we VACATE the superior court's award of attorney's fees to Herring. We AFFIRM the superior court's denial of Patton's contempt motion regarding distribution of the parties' firearms.

---

[23](...continued)
here, a party litigated in the good-faith pursuit of non-frivolous claims. Even if a party does not prevail on some (or all) of his or her claims, we have cautioned against conflating the ultimate success of a motion or claim with the question whether the motion or claim was frivolous at the outset. *See Johnson v. Johnson*, 239 P.3d 393, 401 (Alaska 2010). Here, where Patton prevailed on several of her motions before the superior court — including motions to compel discovery necessitated by Herring's obstructive conduct — it is evident that her claims were not frivolous.